**ABTOX, INC., Plaintiff/Cross–Appellant,**

v.

**EXITRON CORPORATION, Adir Jacob, and Mdt Corporation, Defendants–Appellants.**

Nos. 96–1159, 96–1164.

United States Court of Appeals, Federal Circuit.

Aug. 1, 1997.

William L. Anthony, Jr., Brobek, Phleger & Harrison LLP, of Palo Alto, CA, argued for plaintiff/cross-appellant. With him on the brief were Robert DeBerardine and Karen Y. Spencer.

Donald R. Dunner, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., of Washington, DC, argued for defendants–appellants. With him on the brief were Allen M. Sokal and Howard A. Kwon. Of counsel on the brief were David V. Trask and James R. Duzan, of Trask, Britt & Ross, of Salt Lake City, UT, and John A. Lahive, Jr., Lahive & Cockfield, of Boston, MA.

Before MAYER, MICHEL and RADER, Circuit Judges.

RADER, Circuit Judge.

This case is on appeal from two decisions of the United States District Court for the District of Massachusetts. On cross-motions for summary judgment, the district court first held that AbTox, Inc. (AbTox) does not infringe MDT Corporation's (MDT's) patents. In a separate opinion, the district court held that MDT's use of the invention in pursuit of regulatory approval did not constitute infringement of AbTox's patent. Although the district court misapprehended the prosecution history in construing the claims of MDT's patents, upon review of the claim language, this court affirms.

## I.

In 1993, MDT filed suit for patent infringement against AbTox in the United States District Court for the Central District of California. MDT alleged infringement of two patents issued to Adir Jacob—U.S. Patent Nos. 4,931,261 (the '261 patent), titled an "Apparatus for Dry Sterilization of Medical Devices and Materials," and 4,917,586 (the '586 patent), titled a "Process for Dry Sterilization of Medical Devices and Materials." After dismissal of the California suit without prejudice, and a subsequent filing in the United States District Court for the Northern District of Illinois, the United States District Court for the District of Massachusetts took jurisdiction and consolidated various actions filed elsewhere by the parties. Specifically, MDT refiled its infringement action, and AbTox sought a declaratory judgment of non-infringement of the Jacob patents and further claimed that MDT infringed its U.S. Patent No. 4,321,232 (the '232 patent), a "Package and Sterilizing Process for Same."

These patents disclose devices which sterilize medical instruments in a partially ion-

ized gas, known as plasma. To make plasma, the devices excite a gas with high radio or microwave frequencies. The plasma then emits light, charged particles (ions and electrons), and neutral active components (atoms, excited molecules, and free radicals). These particles and components bombard medical instruments brought into the plasma environment, thereby sterilizing the instruments.

High-energy charged particles, however, can damage delicate medical instruments. Therefore, to avoid these harmful side effects, a sterilizing apparatus must block the charged particles and sterilize only with neutral active components. This objective calls for a Faraday shield, a metal barrier that blocks charged particles. By placing the medical instruments within or behind a Faraday shield within the plasma environment, the neutral active particles alone pass through to accomplish the sterilization. The Jacob patents disclose methods and apparatus to accomplish these objectives.

The Jacob patents spring from a common parent application, application Serial No. 07/19,134 (the '134 application). The application matured into U.S. Patent No. 4,801,427 (the '427 patent). The '261 patent issued on a division of the '134 application and the '586 patent is a continuation of a continuation-in-part of the '134 application. All three patents have nearly identical disclosures.

The written description common to the patents discloses two basic embodiments, one using radio frequencies (RF) and another using microwave frequencies. Figure 3 of the patents (the '427 patent, the '261 patent, and the '586 patent have identical figures) illustrates the plasma sterlizer with the RF source:

In this embodiment, the RF source 22 projects an electrical field into chamber 21 which contains the gas. This action creates plasma in chamber 21. Within chamber 21 is an inner Faraday shield container 23. This Faraday shield container has a basket 25 to hold the medical instrument for sterilization. Thus, the RF source creates plasma within chamber 21, but only the neutral active particles reach past the Faraday shield 23 to sterilize the instruments in the basket.

Figure 2 of the patents shows the microwave embodiment:

In this embodiment, the microwave source 18 is located at one end of chamber 11. Component 17 is the metallic Faraday shield through which the neutral active particles travel to sterilize the instrument 14.

MDT alleges that AbTox infringes claims 3, 6, and 8[1] of the '261 patent and claims 1 and 6 of the '586 patent. Claim 3 of the '261 patent defines an

[a]pparatus for sterilization of medical devices and materials in a gas plasma comprising,

(a) a metallic gas-confining chamber having a non-metallic portion;

(b) a microwave energy source including a microwave cavity positioned to couple microwave energy into said chamber through said non-metallic portion, and

(c) means for holding ... medical devices and materials to be sterilized within said chamber volume and away from said microwave cavity, and including a perforated electrical shielding member positioned within said chamber and in close proximity to said microwave energy source to provide a portion of the internal volume of said chamber shielded from and away from said microwave energy providing a field-free zone containing said devices and materials.

The '586 patent describes the method of MDT's plasma sterilizer. Claim 6 requires:

A method in accordance with claim 1 [of the '586 Patent, which requires a "gas-tight confining chamber",] where in said chamber there is positioned a perforated metallic shield, said shield being substantially equal to the internal cross section of said chamber and located in close proximity to said microwave energy source, thereby providing a substantially field-free zone immediately beyond it and away from said microwave energy source, said field-free zone containing said devices and materials.

The district court determined that the central summary judgment question for infringement was the relationship between the plasma generation zone and the sterilization zone behind the Faraday shield. MDT made two arguments. First, on the claim interpretation question, MDT contended that the Jacob patent claims cover a device featuring a plasma chamber separate from the sterilization zone. In the event the district court interpreted the claims adverse to its "separate chambers" position, MDT also contended that the AbTox device features a single gas-confining chamber.

AbTox, on the other hand, argued that the Jacob patent claims encompass no more than a device featuring a single chamber which both confines the plasma and holds the Faraday shield container. AbTox also presented evidence that its accused device features a plasma chamber separate from the Faraday shield container. In granting AbTox summary judgment, the district court found that the Jacob patents do not encompass devices or methods "in which the plasma is generat-

---

**1.** Because claims 6 and 8 of the '261 patent mirror claim 3, it is unnecessary to provide the text.

ed in an enclosure that is in any way separate from the enclosure in which the sterilization takes place." Based on its finding that the AbTox device employs two chambers, the district court granted AbTox's summary judgment motion. MDT appealed.

## II.

 This court reviews the grant of summary judgment as a question of law. *See KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.,* 997 F.2d 1444, 1449, 27 USPQ2d 1297, 1301 (Fed.Cir.1993). A trial court may award summary judgment only when the parties present no genuine issue of material fact and the moving party deserves judgment as a matter of law. Fed.R.Civ.P. 56(c); *see A.B. Chance Co. v. RTE Corp.,* 854 F.2d 1307, 1310–11, 7 USPQ2d 1881, 1883–84 (Fed.Cir.1988). In assessing the motion, the court must resolve all inferences in favor of the non-movant. *See Opryland USA Inc. v. Great Am. Music Show, Inc.,* 970 F.2d 847, 850, 23 USPQ2d 1471, 1472 (Fed.Cir.1992) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).

 The test for patent infringement requires both proper interpretation of the claim scope and proper comparison of the claims with the accused device. *See Becton Dickinson & Co. v. C.R. Bard Inc.,* 922 F.2d 792, 796, 17 USPQ2d 1097, 1099 (Fed.Cir. 1990). Because MDT and AbTox dispute the meaning of terms in the claims of the patent, this court reviews the district court's claim interpretation under the requirements of *Markman v. Westview Instruments, Inc.,* — U.S. —, —, 116 S.Ct. 1384, 1395, 134 L.Ed.2d 577, 38 USPQ2d 1461, 1470 (1996).

 Claim interpretation is the process of giving proper meaning to the claim language. Claim language, after all, defines claim scope. *See York Prods., Inc. v. Central Tractor Farm & Family Ctr.,* 99 F.3d 1568, 1572, 40 USPQ2d 1619, 1622 (Fed.Cir.1996); *Bell Communications Research, Inc. v. Vitalink Communications Corp.,* 55 F.3d 615, 619–20, 34 USPQ2d 1816, 1819 (Fed.Cir.1995) ("[T]he language of the claim defines the scope of the protected invention."). Therefore, the lan-

guage of the claim frames and ultimately resolves all issues of claim interpretation. In determining the meaning of disputed claim terms, however, a construing court considers the descriptions in the rest of the patent specification, the prosecution history, and relevant extrinsic evidence. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979, 34 USPQ2d 1321, 1329 (Fed.Cir.1995) (en banc), *aff'd,* — U.S. —, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996); *Whittaker Corp. v. UNR Indus.,* 911 F.2d 709, 711, 15 USPQ2d 1742, 1744 (Fed.Cir.1990). These additional sources provide a context to illuminate the meaning of claim terms. *See York Prods.,* 99 F.3d at 1572. Nonetheless, throughout the interpretation process, the focus remains on the meaning of claim language.

 Accordingly, this court begins with the claim language. The language of claim 3 of the '261 patent defines only the microwave embodiment of the invention as illustrated in figure 2. The claim specifies "a metallic gas-confining chamber." Of particular relevance for the claim dispute before this court, the article "a" suggests a single chamber. However, patent claim parlance also recognizes that an article can carry the meaning of "one or more," for example in a claim using the transitional phrase "comprising." *See North Am. Vaccine, Inc. v. American Cyanamid Co.,* 7 F.3d 1571, 1575–76, 28 USPQ2d 1333, 1336 (Fed.Cir.1993) (acknowledging that patent parlance construes "a" to connote "one or more," yet holding that "there is no indication in the patent specification that the inventors here intended it to have other than its normal singular meaning"); *see* Robert C. Faber, *Landis on Mechanics of Patent Claim Drafting* 531 (3d ed.1990).

The terms used in claim 3 of the '261 patent to demarcate the regions of the apparatus—"gas-confining chamber," "microwave cavity," and "field free zone"—are defined in relation to each other. For example, microwave energy from the "microwave cavity" is brought "into said chamber." Therefore, this language separates the "microwave cavity" from the "gas-confining chamber." The claim continues to describe "a portion of the internal volume of said chamber ... provid-

ing a field free [sterilization] zone." This language places the sterilization zone within the "gas-confining chamber."

Repeatedly the claim refers to "said chamber" as it describes various portions of the apparatus. This term itself, "said chamber," reinforces the singular nature of the chamber. The claim does not place the sterilization zone vaguely within "a chamber," but within "said chamber." This language clarifies that only one chamber is in question. Likewise, claim 1 of the '586 patent discloses a "field-free zone away from said [microwave] cavity." This language suggests some separation between the sterilization zone and the microwave cavity. Even this language, however, contains no suggestion of separate gas-confining chambers.

While in some instances claim language alone may disclose unambiguously the limits of claim coverage, *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,* 849 F.2d 1430, 1433, 7 USPQ2d 1129, 1131 (Fed.Cir. 1988), in this instance, this court seeks the meaning of the claim terms by examining their fuller context. The written description supplies additional context for understanding whether the claim language limits the patent scope to a single unitary chamber or extends to encompass a device with multiple gas-confining chambers. Figure 2, for instance, shows a single chamber. That chamber, as described in the claims, features a sterilizing zone separate and downstream from the plasma-generating zone. These zones denote regions and functions within the same chamber, rather than multiple chambers. Nothing in the written description suggests that the claim language encompasses a device with more than one gas-confining chamber. For example, to distinguish the RF sterilizer from the microwave sterilizer, the specification notes that the microwave plasma generator "cannot be mounted concentric about the long axis" shown in figure 2. Col. 7, ll. 57–58. The specification continues:

> [T]he microwave cavity 16 is mounted at one end of chamber 11, and a perforated metallic shield 17 may be placed just beyond it toward the opposite end of the chamber, spanning the entire diameter cross section of the chamber, thus creating

a field-free and glowless reactive zone immediately below it and away from the microwave cavity.

Col 7., ll. 59–65. This explanation discloses a non-metallic sterilization zone separate from the metallic plasma-generating zone within the same chamber. While a Faraday shield lies between the zones, both zones are contained within *the* single chamber 11. MDT argues that these clearly separate zones disclosed in the specification evidence the district court's error in stating that the Jacob patents do not cover plasma generation "in *an enclosure* that is *in any way separate* from *the enclosure* in which the sterilization takes place." To the contrary, although a Faraday shield separates the zones to prevent free passage of particular particles, the zones remain within the same chamber, not in distinct gas-confining chambers.

The record of administrative proceedings at the Patent and Trademark Office (PTO) provides additional context for understanding the claim terms. As briefly discussed above, the '261 and '586 patents have a common parent application which matured into the '427 patent. The '427 patent claimed both microwave and RF embodiments. Claim 2 of the '427 patent, for instance, defines a plasma generator with an RF energy source. During the prosecution of the '427 patent application, the examiner rejected independent application claim 2 and dependent application claim 7 as being unpatentable over prior art. Application claim 2, as amended, read:

> A method for sterilization of medical devices and materials comprising the steps of, placing said devices and materials within a gas-tight confining chamber wherein said chamber is cylindrical, formed from metal, and includes an internal electrode formed as a perforated metallic cylinder positioned within, and generally concentric with, said chamber cavity, evacuating said chamber ...; initiating an electrical discharge in said gas within said chamber by application of RF energy between the metal container wall and said internal electrode creating a gas plasma; and maintaining said gas plasma for a controlled period of time, said chamber cavity creating a

field free and glowless volume within the perforated cylinder, said devices and materials being placed within said field free and glowless volume.

Dependent claim 7 read: "A method in accordance with claim 2 wherein said gas is flowed through said chamber during said discharge." Both claim 2 and claim 7 clearly and explicitly specified an RF electric field source.

In the rejection, the examiner noted that claim 7 was obvious in "further view of Fraser et al [U.S. Patent No. 3,851,436]. To flow the plasma gas through the chamber during the sterilization process in order to increase the effect of the sterilizing plasma gas would be obvious as taught by Fraser et al." Fraser, entitled "Sterilizing and Packaging Process Utilizing Gas Plasma," discloses a gas plasma sterilization process using an RF electric field source. As illustrated below, Fraser discloses a sterilizer with an upstream RF generator, wherein the sterilization chamber is separate from the plasma generator:

Fraser discloses neither a concentrically arranged sterilizer nor a sterilizer utilizing a microwave source.

Jacob responded by canceling claims 2 and 7 and adding new claims 50–59. Claims 50–52 and 57–59 specified a method using an RF electric field source. Claims 53–56 claimed a method using microwave sources. For example, independent claim 50, which combined the limitations of 2 and 7, read:

A method for sterilization of medical devices and materials comprising the steps of,placing said devices and materials within a metallic perforated electrode, generally cylindrical in shape, said electrode being positioned within, and generally concentric with, a gas-tight confining chamber, said chamber being generally cylindrical, formed from metal and connected to a point of potential reference,evacuating said chamber ...,initiating an electrical discharge in said gas within said chamber by *application of RF voltage* between said internal perforated electrode and the metal chamber wall, creating a gas plasma, having a field free and glowless volume within the perforated electrode containing said devices and materials,maintaining said gas plasma ...,maintaining a flow of said gas through said chamber during said electrical discharge; and,evacuating the gas plasma residual gases from said chamber prior to withdrawing said devices and materials from it.

(Emphasis added.) Independent claim 53 read:

A method for sterilization of medical devices and materials comprising the steps of, placing said devices and materials within a gas-tight confining chamber, said

chamber being generally cylindrical, formed from non-metallic material, evacuating said chamber ..., initiating a microwave discharge in said gas within said chamber by *application of microwave energy* at one end of said chamber remote from said devices and materials creating a gas plasma, maintaining said gas plasma ..., maintaining a flow of said gas through said chamber during said electrical discharge; and, evacuating the gas plasma residual gases from said chamber prior to withdrawing said devices and materials from it.

(Emphasis added.) Thus, these different claims specified different energy sources.

To clarify his changes to overcome the examiner's rejections, Jacob explained his amendments:

Each of Applicant's independent Claims 50, 51 and 52 are limited to methods including such [a concentric] arrangement and [RF] electrical methodology.... .

The Fraser reference discloses a method which differs sharply from Applicant's method. In essence Fraser generates his plasma in a nonconducting glass reactor capacitively coupled to an RF source, and *exposes materials to be sterilized in a separate chamber away from and downstream from the plasma generating device. Applicant performs the sterilization process within the confines of the plasma generating device.*

From previous considerations, Fraser's method yields high plasma potentials, coupled with elevated processing temperatures. However, due to this separation, the net concentration of active species reaching the sterilization chamber is substantially reduced by exponential decay processes of these species during their time-of-flight from one place to the other. Fraser's corresponding process' inefficiency manifests itself by its incapability to sterilize material through hermetically sealed enclosing packages ... in clear contradiction to Applicant's method capability.

(Emphasis added.) Jacob clearly restricted this argument to claims 50–52. These arguments were not relevant at all to the microwave embodiment of Jacob's invention. As

to claims 53 and 54, the microwave energy source claims, Jacob argued: "Claim 53 is directed to a method employing a microwave energy source. None of the prior art shows any recognition that the plasma so generated would be suitable for sterilization purposes." As to claim 56, Jacob argued: "None of the art shows or suggests a plasma chamber with a microwave energy source and a perforated shield...."

Following these actions, the examiner determined that the claims to a microwave-generated plasma process were an independent and distinct invention. The examiner, therefore, required Jacob to cancel the claims pertaining to microwave energy sources. Subsequently, the application containing the claims of the RF embodiment matured into the '427 patent, which consequently limits Jacob's RF source claims to only a concentric configuration apparatus. Jacob then claimed the microwave-generated plasma in continuing applications. At all times during the prosecution, Jacob maintained the distinction between the microwave and RF embodiments. Jacob's RF energy claims feature concentric configurations while the microwave energy claims permit separate zones—but not separate gas-confining chambers—for plasma generation and sterilization.

In considering the prosecution history, the trial court erred by importing limitations from the disclosures of RF technology into the claims applicable solely to microwave technology. Without acknowledging the distinction between RF and microwave claims, the district court merely referred generically to the parent application to apply a limitation to both kinds of claimed devices:

The prosecution history of the Jacob Patents contains clear and unambiguous statements to the effect that MDT's device is materially different from devices in which the plasma is generated in an enclosure that is in any way separate from the enclosure in which sterilization takes place.

899 F.Supp. at 781. However, upon closer inspection, Jacob's statements about RF technology during the prosecution of the '427 patent application are not relevant to this dispute over microwave-generated steriliza-

tion. The district court erred by applying limits applicable only to RF technology to this dispute over microwave technology. Read in context, the prosecution history supplies no express single chamber limitation on microwave sterilizers, though such a limitation clearly applies to RF technology.

The prosecution history relevant to this dispute includes not only the two distinct Jacob patent applications, but also the parent application. *See Jonsson v. Stanley Works,* 903 F.2d 812, 818, 14 USPQ2d 1863, 1869 (Fed.Cir.1990) (prosecution history of parent application is relevant to understanding scope of claims issuing in a continuation-in-part application); *Mark I Mktg. Corp. v. R.R. Donnelley & Sons Co.,* 66 F.3d 285, 291, 36 USPQ2d 1095, 1100 (Fed.Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 917, 133 L.Ed.2d 847 (1996). However, statements in the parent application must be confined to their proper context and properly acknowledge the distinctions between RF and microwave claims. The prosecution history relied upon by the district court ("Applicant performs the sterilization process within the confines of the plasma generating device."), however, refers only to RF plasma generators, not to the microwave plasma generator in this case. In other words, the arguments made by Jacob to distinguish claims 50–52 over Fraser are drawn to the RF embodiment. As can be seen in figure 3, *supra,* the sterilization occurs within the cylindrical Faraday shield which itself is within the surrounding wall of the chamber. Thus, for the RF embodiment, the Jacob patent does "perform[ ] the sterilization process within the confines of the plasma generating device." This single chamber limitation, however, is neither necessary nor applicable to the microwave embodiment.

The district court misread the prosecution history, but nonetheless arrived at a correct single chamber limitation for microwave sterilizers. That reliance on the prosecution history was in error. Nevertheless, because the claim language, as interpreted in light of the specification, limits the microwave devices to a single gas-confining chamber, this court affirms the district court's grant of summary judgment.

## III.

In a counterclaim, AbTox alleged that MDT infringed its '232 patent. MDT moved for partial summary judgment on the basis that 35 U.S.C. § 271(e)(1) (1994) shielded its activities from infringement. In a separate opinion, the district court granted MDT's motion and certified for immediate appeal the legal question of whether section 271(e)(1) precludes infringement. 888 F.Supp. 6 (D.Mass.1995).

During the development of a plasma sterilizer, Jacob and his company Exitron hired MDT to conduct tests on the device. Between 1990 and 1993, Exitron and MDT conducted limited tests consistent with the collection of data necessary for filing an application with the Food and Drug Administration (FDA) for approval of its Class II medical device. AbTox alleges that the actual purpose of these tests was not to secure FDA approval, but was intended, *inter alia,* to promote the plasma sterilizer and other equipment to potential customers and induce MDT to purchase the rights to the device, which it did in 1993. At the time of this litigation, MDT had neither filed an application for approval with the FDA nor otherwise marketed the device.

35 U.S.C. § 271(e)(1) states:

> It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention ... solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products.

By its terms, this shield from infringement permits use of "patented invention[s]" to acquire information for regulatory approval of "drugs or veterinary biological products." The patented invention in this case, however, is a Class II medical device. Thus, the legal question arises of whether section 271(e)(1) applies in this setting. AbTox argues, first, that section 271(e)(1) is inapplicable to the plasma sterilizer. Second, AbTox insists that even if section 271(e)(1) applies, MDT's use

**1028**

was not reasonably related to FDA approval. Because this issue depends on statutory construction, this court reviews the district court's judgment as a question of law. *See Romero v. United States,* 38 F.3d 1204, 1207 (Fed.Cir.1994).

### A.

■ In *Eli Lilly & Co. v. Medtronic, Inc.,* 496 U.S. 661, 110 S.Ct. 2683, 110 L.Ed.2d 605 (1990), the Supreme Court held that section 271(e)(1) applies to medical devices in addition to drugs and veterinary biological products. Nevertheless, AbTox argues that the noninfringement provision of section 271(e)(1) does not apply to the type of medical device at issue. Because this issue appears to raise a novel question of law—the applicability of section 271(e)(1) to Class II medical devices—this court interprets the statutory language in view of the Supreme Court's reading of the passage and the overall statutory scheme of Title 35 and medical device regulation.

The Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. §§ 301–395 (1994), through the Medical Device Amendments of 1976, classifies medical devices in three categories based on the risk posed by their use. The Supreme Court recently discussed the classification of devices:

> Devices that present no unreasonable risk of illness or injury are designated Class I and are subject only to minimal regulation by "general controls." 21 U.S.C. § 360c(a)(1)(A). Devices that are potentially more harmful are designated Class II; although they may be marketed without advance approval, manufacturers of such devices must comply with federal performance regulations known as "special controls." *Id.* § 360c(a)(1)(B). Finally, devices that either "present a potential unreasonable risk of illness or injury," or which are "purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health," are designated Class III. *Id.* § 360c(a)(1)(C).

*Medtronic, Inc. v. Lohr,* — U.S. —, —, 116 S.Ct. 2240, 2246, 135 L.Ed.2d 700 (1996).

While new Class III devices must undergo a rigorous premarket approval process, *see* 21 U.S.C. § 360e, Class I and II devices enjoy an abbreviated approval process, *id.* § 360(k). As the Supreme Court noted, the approval process for Class II devices "is by no means comparable" to the premarket approval necessary for Class III devices. *Medtronic,* — U.S. at —, 116 S.Ct. at 2247.

In *Eli Lilly,* the Supreme Court addressed the question of whether any medical devices fell within the noninfringement provision of section 271(e)(1). The devices examined by the Court in *Eli Lilly,* implantable cardiac defibrillators, were Class III devices. Eli Lilly argued that the statute covered only uses related to "a Federal law which regulates . . . *drugs or veterinary biological products.*" § 271(e)(1) (emphasis added). Because medical devices were not "drugs or veterinary biological products," Eil Lilly argued, the unauthorized use of the cardiac defibrillators did not fall within the express terms of the shield.

The Supreme Court, however, interpreted the phrase "a Federal law" to refer to "an entire statutory scheme of regulation" not merely to single sections or subsections related to drugs or veterinary biological products. *Eli Lilly,* 496 U.S. at 666, 110 S.Ct. at 2686. Therefore, the Court broadly held that section 271(e)(1) applies to any use reasonably related to regulation under the FDCA, which certainly includes Class II devices.

The Court, however, also based its analysis on the entire statutory scheme of the Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98–417, 98 Stat. 1585 (the 1984 Act), from which the noninfringement provisions of section 271(e)(1) arose. The 1984 Act added two fundamental concepts to the patent statute. Section 202 of the 1984 Act added the infringement shield of 35 U.S.C. § 271(e). Of equal importance, section 201 of the 1984 Act supplied a partial restoration of patent terms when the lengthy regulatory approval process delays marketing of patented inventions. Thus, section 201 added the patent term extensions of 35 U.S.C. §§ 155–56 (1994).

As recognized by the Court in *Eli Lilly*, the infringement shield of section 271(e) and the patent term extension of section 156 are the result of debate and compromise. Section 156 supplied patentees, mostly large research and development operations, the benefits of term extensions to erase the de facto reduction of their patent term. Section 271(e) supplied potential infringers, for example generic drug manufacturers, the benefits of an infringement shield to erase the de facto extension of the patent term caused by the requirement to await patent expiration before starting the tests for regulatory compliance. Thus the 1984 Act supplied tradeoff benefits to competing segments of the pharmaceutical industry. From the perspective of R & D pharmaceutical corporations, for instance, the law giveth, section 156, and the law taketh away, section 271(e)(1).[2]

In addition to the interpretation of "a Federal law," the Court in *Eli Lilly* discussed and found support for its interpretation in the interplay between section 156 and section 271(e). *Eli Lilly*, 496 U.S. at 673, 110 S.Ct. at 2690 ("[T]here are textual indications that sections 201 and 202 [of the 1984 Act] are meant generally to be complementary."). In other words, in determining which products fit within the bounds of § 271(e)(1), the Court looked to the far more explicit § 156. The Court stated:

> Interpreting § 271(e)(1) as the [Federal Circuit] did here appears to create a perfect "product" fit between the two sections. All of the products eligible for a patent term extension under [§ 156] are subject to [§ 271(e)(1) ], since all of them ... are subject to premarket approval under various provisions of the FDCA....

496 U.S. at 673–74, 110 S.Ct. at 2690. *See Eli Lilly & Co. v. Medtronic, Inc.*, 872 F.2d 402, 405 (Fed.Cir.1989) ("[T]he benefits of patent extension are not restricted to drugs, but extend to medical devices."), *aff'd*, 496 U.S. 661, 110 S.Ct. 2683, 110 L.Ed.2d 605 (1990).

This Supreme Court reasoning creates the rub for this case. As the Supreme Court reasoned, Class III devices are eligible for a patent term extension under section 156, and therefore application of the section 271 infringement shield to these devices creates a convenient statutory symmetry. Title 35 both giveth and taketh away. Class II devices, however, are not eligible for patent term extensions. Specifically, section 156 defined the method of calculating the regulatory review period for a corresponding term extension. The section limits the regulatory review period for medical devices to those devices that require review under section 515 of the FDCA. 35 U.S.C. § 156(g)(3)(B). In turn, 21 U.S.C. § 360e [FDCA § 515] applies only to Class III devices. Title 35 thus supplies no extension for Class II devices, such as the plasma sterilizer at issue in the instant case.

Therefore, under the broad holding of *Eli Lilly*, all classes of medical devices fall within the plain meaning of section 271(e)(1). Nevertheless, under the Court's narrower justification of statutory symmetry, only Class III devices fall within the section. Ultimately, this court must follow the Supreme Court's broader holding, which remains in force despite a potential conflict with its own narrower reasoning. Section 271(e)(1) makes no distinctions based upon the different FDA classes of medical devices or drugs. Moreover, the Court explicitly accepted a statutory interpretation "in which a patentee will obtain the advantage of the [section 156] extension but not suffer the disadvantage of the [section 271(e)(1) ] noninfringement provision, and others in which he will suffer the disadvantage without the benefit." 496 U.S. at 671–72, 110 S.Ct. at 2689–90. In other words, the Supreme Court commands that statutory symmetry is preferable but not required. Therefore, the Supreme Court disposed of the argument, made here by AbTox, that section 271(e)(1) is limited to Class III devices. Section 271(e)(1) contains no such limitation.

**B.**

■ Contrary to AbTox's second contention regarding the scope of the provision,

**2.** The 1984 Act contained additional provisions, *e.g.*, authorization of the filing of abbreviated new drug applications; nevertheless, for the instant analysis those provisions need not be discussed.

section 271(e)(1) requires only that the otherwise infringing act be performed "solely for *uses* reasonably related to" FDA approval. 35 U.S.C. § 271(e)(1) (emphasis added). The statute, therefore, does not look to the underlying purposes or attendant consequences of the activity (*e.g.*, tests led to the sale of the patent), as long as the use is reasonably related to FDA approval. In other words, the statutory language allows MDT to use its data from the tests for more than FDA approval. *See Telectronics Pacing Sys., Inc. v. Ventritex Inc.*, 982 F.2d 1520, 1524–25, 25 USPQ2d 1196, 1199 (Fed.Cir.1992) (demonstration at conference and dissemination of data to investors for business purposes held noninfringement) ("If Congress intended to make [immediate competition at the end of the patent term] more difficult, if not impossible, by preventing competitors from using, in an admittedly non-infringing manner, the derived test data for fund raising and other business purposes, it would have made that intent clear."). As long as the activity is reasonably related to obtaining FDA approval, Jacob's intent or alternative uses are irrelevant to its qualification to invoke the section 271(e)(1) shield. Even drawing all factual inferences in favor of AbTox, the activities of MDT were either non-infringing or reasonably related to seeking FDA approval.

## IV.

For the reasons stated above, this court affirms the district court's holding granting AbTox's motion for summary judgment of non-infringement of MDT's asserted patents. In addition, this court affirms the district court's holding of non-infringement of the '232 patent.

## COSTS

Each party shall bear its own costs.

## *AFFIRMED*