**AMGEN, INC. Plaintiff,**

v.

**HOECHST MARION ROUSSEL, INC. and Transkaryotic Therapies, Inc. Defendants.**

**Civil Action No. 97–10814–WGY.**

United States District Court, D. Massachusetts.

April 15, 1998.

Michael R. Gottfried, Dennis D. Allegretti, Burns & Levinson, Boston, MA, Douglass C. Hochstetler, Edward M. O'Toole, Jane J. Choi, Michael F. Borun, Marshall, O'Toole, Gerstein, Murray & Borun, Chicago, IL, for Plaintiff.

Robert S. Frank, Jr., Mark A. Michelson, Choate, Hall & Stewart, Boston, MA, Peter

C. McCabe, III, Raymond C. Perkins, Winston & Strawn, New York City, Steven F. Molo, Winston & Strawn, Chicago, IL, Kenneth B. Herman, Herbert F. Schwartz, James F. Haley, Jr., Russell W. Faegenburg, Fish & Neave, New York City, for Defendants.

### MEMORANDUM AND ORDER

YOUNG, District Judge.

The Plaintiff, Amgen, Inc. ("Amgen"), brings this action against the Defendants, Hoechst Marion Roussel, Inc. ("Hoechst") and Transkaryotic Therapies, Inc. ("Transkaryotic") (collectively "the Defendants"), alleging patent infringement. Amgen holds several patents covering a recombinant (genetically engineered) form of erythropoietin ("EPO"), a hormone that stimulates the body's production of red blood cells. EPO is used in the treatment of anemia, particularly in patients suffering chronic renal failure. Amgen has successfully marketed embodiments of its EPO patents, called EPOGEN and NEUPOGEN.

Transkaryotic has entered into a collaborative agreement with Hoechst, a subsidiary of the German pharmaceutical giant Hoechst AG, in order to develop a competing EPO product, GA–EPO. Amgen contends in Count I of the complaint that the Defendants, in pursuing this development, have infringed its patents by making and using significant quantities of patented EPO. In Count II of the Complaint, Amgen requests a declaration that the Defendants will infringe its patents in the future.

### BACKGROUND

This case was previously before the Court on the Defendants' motion to dismiss, or in the alternative for summary judgment, on the grounds that the actions complained of fell within the limited clinical trials exemption created by 35 U.S.C. § 271(e)(1).[1] The Court denied both motions orally from the bench, to allow Amgen an opportunity for necessary discovery, without prejudice to a renewed motion for summary judgment at an appropriate time. The parties have now completed their discovery pursuant to the Court's Pretrial Order of July 24, 1997.

The Defendants renew their motion for summary judgment, arguing that their activities fall under the section 271(e)(1) exemption, and that this Court has no jurisdiction to issue declaratory relief. Amgen, in turn, moves for partial summary judgment of infringement under Count I and summary declaration under Count II. In response, the Defendants reassert their section 271(e)(1) defense, and dispute Amgen's patent construction as well as the infringement analysis. The Defendants also renew their request for additional time under Fed.R.Civ.P. 56(f) to conduct discovery directed at the question of infringement.

It is helpful to sort out this tangle of motions into three distinct issues. First, does the section 271(e)(1) exemption shield the Defendants' activities from liability for infringement? Second, if so, does the Court nonetheless have jurisdiction to grant declaratory relief? Third, if there is any jurisdictional basis for the Court to consider the merits of the case, is there patent infringement?

### DISCUSSION

#### A. Summary Judgment

Judgment is appropriate under Fed.R.Civ.P. 56 if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see A.B. Chance Co. v. RTE Corp.*, 854 F.2d 1307, 1310–11 (Fed.Cir. 1988). In deciding the motions, the Court resolves all disputed facts and inferences in favor of the non-moving party. *See Opryland USA Inc. v. Great Am. Music Show, Inc.*, 970 F.2d 847, 850 (Fed.Cir.1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

---

1. 35 U.S.C. § 271(e)(1) states:

   It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a patented invention ... solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products.

242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 [1986] ). Nevertheless, if there are no genuine issues of material fact, summary judgment is as appropriate in a patent infringement case as in any other. *See Moeller v. Ionetics, Inc.,* 794 F.2d 653, 656 (Fed.Cir. 1986); *Chore–Time Equip., Inc. v. Cumberland Corp.,* 713 F.2d 774, 778–79 (Fed.Cir. 1983). Under the proper circumstances, the Court will strive to avoid a long, complex, and unnecessary trial.

### B. Section 271(e)(1).

The first question before the Court is whether any of six allegedly infringing activities Amgen has identified during discovery fall under the section 271(e)(1) exemption. Section 271(e)(1) permits research and development activities that would otherwise constitute patent infringement if they are conducted solely for uses reasonably related to the development and submission of information to the FDA. *See* 35 U.S.C. § 271(e)(1). The measure is one half of a 1984 legislative compromise, the Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98–417, 98 Stat. 1585, designed to alleviate the unintended effects of the FDA approval process on the length of pharmaceutical patent terms. The other half, section 156, allows patent holders to extend the term of their patent up to five years to compensate for delays caused by FDA approval. 35 U.S.C. § 156(g)(6)(A); *see Abtox, Inc. v. Exitron Corp.,* 122 F.3d 1019, 1029 *amended by,* 131 F.3d 1009 (Fed.Cir.1997); *Telectronics Pacing Sys., Inc. v. Ventritex, Inc.,* 982 F.2d 1520, 1524–25 (Fed.Cir.1992).

■ The Federal Circuit has identified several important aspects of the section 271(e)(1) exemption. First, section 271 applies generally only to activities that might constitute infringement. Thus, a defendant need not show that all of its conduct falls under the section 271(e)(1) exemption, only the making, using, or selling of the claimed invention. All other conduct falls outside the section 271(a) definition of infringement in the first instance. *See Telectronics,* 982 F.2d at 1525.

■ Second, the potentially infringing activity must be "solely for uses" related to FDA approval. The Federal Circuit has approved of uses such as demonstration of the invention itself to recruit clinical investigators, *Telectronics,* 982 F.2d at 1523, and hiring an outside firm to conduct testing on the invention, even though the decision to do so was motivated by the hope that the testing firm would purchase the rights to the device. *Abtox,* 122 F.3d at 1027, 1029–30. The statute "does not look to the underlying purposes or attendant consequences of the activity ... as long as the use is reasonably related to FDA approval." *Id.* at 1030. "[I]ntent or alternative uses are irrelevant" to the inquiry. *Id.*[2]

A number of district courts, including the District of Massachusetts, have applied the statute in ways that suggest a narrower scope. In *Scripps Clinic & Research Found. v. Genentech, Inc.,* 666 F.Supp. 1379 (N.D.Cal.1987), the court read the statute to require that the "use is solely for purposes reasonably related to" FDA approval, held that the defendant must use the invention for meeting FDA requirements, and for no other purposes. *Id.* at 1396. Thus, sales and uses having multiple purposes fell outside the statutory exemption. *Id.; see also Biogen, Inc. v. Schering AG,* 954 F.Supp. 391, 396 (D.Mass.1996) (concluding without discussion that large scale production and market preparation took defendant out of "safe harbor"). This analysis conflates the statutory concept of "uses" with the concept of "purpose."

The phrase "solely for uses reasonably related" is not equivalent to the phrase "use is solely for purposes reasonably related." The later reflects a more restrictive view of permissible activities under the statute. Uses, such as animal testing, human clinical trials, or chemical composition analysis, may be related to FDA approval, and yet be conducted

---

**2.** Amgen contends that the issue of what the statute means by "solely" has not been squarely addressed by the Federal Circuit. Amgen urges the Court to limit the application of section 271(e)(1) where the information produced in connection with FDA approval is also submitted to foreign regulatory agencies. This view is inconsistent with the Federal Circuit's broad interpretation of the provision.

for *purposes* other than, or in addition to, obtaining FDA approval. The Federal Circuit precedents indicate that such ulterior motives or alternate purposes do not preclude application of the section 271(e)(1) exemption.[3]

■ Finally, the use must be reasonably related to (albeit not for the exclusive purpose of) FDA approval. The Federal Circuit has not squarely addressed this aspect of the analysis. The district court in *Intermedics, Inc. v. Ventritex, Inc.*, 775 F.Supp. 1269 (N.D.Cal.1991), *aff'd*, 991 F.2d 808, 1993 WL 87405 (Fed.Cir.1993) (non-precedential), framed the relevant inquiry thus:

> [W]ould it have been reasonable, objectively, for a party in defendant's situation to believe that there was a decent prospect that the "use" in question would contribute (relatively directly) to the generation of kinds of information that was likely to be relevant in the processes by which the FDA would decide whether to approve the product? If the answer is yes, it should not matter that other reasonable persons might have concluded that FDA approval could be secured even without the information in question.

775 F.Supp. at 1280. The Federal Circuit cited this opinion with approval in *Telectronics*, 982 F.2d at 1525 n. 5, and subsequent district court opinions have adopted the same formulation. *See Abtox, Inc. v. Exitron Corp.*, 888 F.Supp. 6, 8 (D.Mass.1995), *aff'd*, 122 F.3d 1019 (Fed.Cir.1997); *NeoRx Corp.*

*v. Immunomedics, Inc.*, 877 F.Supp. 202, 205 (D.N.J.1994). The test is prospective, in that it evaluates the potential infringer's activities at the time they were undertaken, and objective, in that it does not concern itself with the potential infringer's state of mind. It thus acknowledges the inherently unpredictable nature of the FDA approval process. This Court finds the *Intermedics* test to be consistent with the statutory scheme and existing Federal Circuit law, and adopts it in the resolution of this case.

In order to come within the protection of section 271(e)(1), the Defendants thus must make, use, or sell the patented invention in ways that objectively bear reasonable prospects of yielding information that might be relevant in the FDA approval process. If the Defendants have confined themselves to such uses, then their subsequent use of the information gathered, their ulterior motives for engaging in the research, and the existence of other more promising or less extensive uses that also might have lead to FDA acceptance are all statutorily irrelevant factors.

### C. Potentially Infringing Activities

Amgen advances six potentially infringing activities, the performance of which the Defendants do not dispute. Rather, the Defendants maintain that all six uses were reasonably related to the FDA approval process.[4] Most of the activity in question involves a batch of EPO (Batch 07 from cell line 22–3)

---

**3.** Contrary to the court's reasoning in *Scripps*, the word "solely" is not rendered superfluous by the Federal Circuit's reading. *But see* Amy Stark, Comment, *The Exemption from Patent Infringement and Declaratory Judgments: Misinterpretation of Legislative Intent?*, 31 San Diego L.Rev. 1057, 1072–78 (1994) (arguing that the Federal Circuit's interpretation is contrary to Congress' intent in enacting section 271[e][1]). Rather, it mandates that the making, using, or selling of the patented invention cannot be for uses that are *not* reasonably related to FDA approval; that is, uses which could not reasonably be expected to lead to the production of information that could be used to satisfy FDA reporting requirements.

**4.** Amgen's contention that the Defendants bear the burden of establishing their eligibility for the section 271(e)(1) exemption as an affirmative defense is a red herring. It is not clear whether the

exemption is an affirmative defense, rather than a part of the statutory definition of infringement that Amgen must establish. Regardless, Amgen's attempt to compel the Defendants to account for "every infringing manufacture and use" and not merely those uncovered by Amgen's discovery asks too much. A defendant, even one that bears the ultimate burden of persuasion on an affirmative defense, need not establish that defense with respect to claims that the plaintiff has not raised. Presuming that the exemption is an affirmative defense, the Defendants need only provide competent evidence sufficient to create a genuine issue of material fact as to the six instances of infringement Amgen identifies in its summary judgment motion. In like manner, if the Court concludes based on the undisputed facts that section 271(e)(1) applies to those six instances, then the relative burdens incident to an affirmative defense need not detain this analysis.

made in Pease, New Hampshire by a contract manufacturer. It is the making and using of this batch that must constitute patent infringement, or in the alternative, must be for uses related to FDA approval.

### 1. Export to Japan

█ The parties agree that Hoechst exported a quantity of EPO from Batch 07 to its Japanese affiliate in early part of 1997 to be used as a standard reference in studies being conducted to evaluate an alternative manufacturing process. The extant process, employed at the Pease facility, is the one for which the Defendants are currently seeking FDA approval. Amgen contends that this shipment bore no reasonable relationship to FDA approval because no approval had been (or has yet been) sought for the alternative process. The Defendants reply that the Japanese study is one of a number of efforts to improve its manufacturing process, and acknowledge that they will defer action on those alternative processes until after FDA approval of GA–EPO.

The material facts are thus undisputed. The question for the Court is whether the shipment was reasonably calculated to generate information that would be relevant to the FDA approval process. There is no question but that an alternative manufacturing process would require separate FDA approval. See 21 C.F.R. § 601.12(b). Moreover, the FDA guidelines contemplate the use of a reference standard sample from one manufacturing process to evaluate the effects of alterations in that process. See Center for Biologics Evaluation and Research and Ctr. for Drug Evaluation and Research, *FDA Guidance Concerning Demonstration of Comparability of Human Biological Products* 3–6 (1996) at 3–6, App. Defs.' Mem. Supp. Mot. Summ. J. (hereinafter "Def.App.") Tab 25. The Defendants' efforts to evaluate that process were therefore within the class of activities protected by the statute, regardless of whether they had sought FDA approval at the time. *See Ab-*

*tox,* 122 F.3d at 1027, 1029–30. Amgen cannot defeat application of the statute merely by questioning the Defendants' sincerity, and thus has raised no genuine issue of material fact.

### 2. Rabbit Pyrogen Studies

█ The FDA requires that a candidate biologic pharmaceutical product be tested for purity. 21 C.F.R. § 610.13. Among the impurities which must be identified are pyrogens (fever-causing agents). The two means of detecting pyrogens are the Limulus Amebocyte Lysate (LAL) test, an *in vitro* test that detects the presence of certain toxins, and the rabbit pyrogen test, which involves the *in vivo* injection of the biologic into rabbits. The parties agree that the defendants performed both kinds of tests on GA–EPO, and that the defendants did not submit the rabbit pyrogen test data to the FDA. Amgen contends that the use of Batch 07 to conduct rabbit pyrogen tests was not reasonably related to FDA approval, and that it was actually carried out in order to satisfy European regulatory requirements.

Amgen characterizes the LAL test as the preferable test, and points to FDA guidelines authorizing the use of LAL in lieu of the rabbit pyrogen test. Those guidelines state that a "person who follows an agency guideline may be assured that the procedures or standards will be acceptable to FDA." Center for Drug Evaluation Research et al., U.S. Dep't of Health and Human Services *Guideline on Validation of the Limulus Amebocyte Lysate Test as an End–Product Endotoxin Test for Human and Animal Parenteral Drugs, Biological Products, and Medical Devices* 3 (1987) (Pl.'s Ex. 156, p. 3).[5] Amgen also notes that the rabbit tests actually carried out by the Defendants used an insufficient dosage of the material to satisfy FDA requirements. 21 C.F.R. § 610.13. The Defendants do not dispute this information.

In response, the Defendants maintain that rabbit pyrogen testing is still a widely used and acceptable method of pyrogen testing.[6]

**5.** The guideline also expressly states, however, that it is not a legal requirement, and notes that persons not following the guideline should be able to assure the adequacy of their own methods "through validation." *Id.*

**6.** It is not disputed that LAL tests identify only a subset of the pyrogens that are identified by the

They also state that, while the results of the rabbit pyrogen tests were not reported to the FDA, they were conducted to confirm the purity and safety of GA–EPO for use in clinical trials, which would produce data that would itself be submitted to FDA, and therefore such conduct was reasonably related to the FDA approval process. At least one district court is in accord. See *Intermedics*, 775 F.Supp. at 1284–85. In that case, the court found that safety tests not reported to foreign regulators or the FDA were reasonably related to generating data for submission to the FDA because the tests were necessary to obtain German import approval to conduct the FDA trials in Germany. This is consistent with the rule that, so long as a use is calculated to lead to relevant information for submission, that use falls within the section 271(e)(1) exemption. Thus, even if the results of the rabbit pyrogen tests would have been unacceptable to the FDA, they were still reasonably related to the approval process. As stated by the *Intermedics* court, "[i]t does not follow from the undisputed fact that it was not *necessary* [to conduct a given test] to obtain FDA approval that [such tests] were not *reasonably related* to obtaining FDA approval." *Id.* at 1284 (emphasis added). Amgen's contention that the rabbit pyrogen tests were unnecessarily burdensome and designed to satisfy foreign regulatory requirements is inapposite. The inference to be drawn that the Defendants had other purposes in mind when conducting these studies, even if accepted as true, is statutorily irrelevant.

Based on the undisputed facts, this Court concludes that the rabbit pyrogen tests were reasonably related to FDA clinical trials, and therefore are exempt under section 271(e)(1).

### 3. Consistency Batches

■ The parties agree that, in addition to Batch 07, the Defendants also produced at least three more commercial scale production batches of GA–EPO. The FDA re-

quires that a manufacturer demonstrate the consistency of its manufacturing process by producing three consecutive batches within certain tolerances of a standard reference.[7] *See* FDA, *Guidance Concerning Demonstration of Comparability* at 19, Def.App., Tab 25. The Defendants acknowledge that the first two batches were consistent with one another, Unwin II Tr. at 12–14, but that they were not satisfied with the potency of the batches, and do not plan to submit them to the FDA in satisfaction of the consistency batch requirement. Amgen asserts that the Defendants abandoned a successful effort to demonstrate consistency because of their commercial disappointment in the product quality. Amgen contends that this abandonment negates any contention that the making of the EPO batches was reasonably related to seeking regulatory approval.

Amgen's post hoc analysis misses the mark. The Defendants are protected by the statute if the production of the three batches of GA–EPO was objectively likely to generate useful information, even if the results were later discarded or abandoned for reasons unrelated to FDA approval. The exemption is not so ephemeral that it will be lost as a result of conduct which postdates the making, using, or selling of the patented product. *Telectronics*, 982 F.2d at 1524. The retention of the GA–EPO following its manufacture is not an activity that could constitute infringement under section 271(a). *Cf. id.* at 1523–24.

### 4. Characterization of GA–EPO

■ The parties agree that the Defendants have attempted to characterize the carbohydrate structure (glycosylation) of GA–EPO, and have compared the structure with that of human urinary source erythropoietin, a form of the hormone that is produced by the human body. The Defendants point to FDA regulations and guidelines that require

---

rabbit pyrogen tests, even though LAL is acceptable to FDA.

**7.** Amgen asserts that the Defendants planned a total of five batches, but abandoned those plans during the course of this litigation. Amgen states that five consistent batches are required by

Japanese and European regulatory agencies. This information amounts to little more than innuendo. Planning but failing to make the patented invention, regardless of the intended use, cannot constitute infringement.

such characterization as part of the approval process, *see* 21 C.F.R. § 610.18(c); 21 C.F.R. § 312.23(a)(7) Center for Biologics Evaluation and Research, *Points to Consider in the Characterization of Cell Lines Used to Produce Biologicals* at 3, 8–9 (1993) (Def.App. Tab 23); Center for Biologics Evaluation and Research and Center for Drug Evaluation and Research, *Guidance for Industry* at 10–11 (Aug.1996)(Def. App. Tab 24), and state that they have submitted the preliminary results of their characterization efforts to the FDA. Amgen contends that this use was directed solely at evaluating the Defendants' patent position with respect to Amgen's patents. Amgen asserts without support that the proper comparison for FDA submissions would be with Amgen's EPO, and not with urinary source EPO. On the strength of that assertion, Amgen concludes that the comparison was conducted solely to determine if the Defendants infringed on Amgen's patents.

Amgen raises no genuine issue as to the FDA requirement for characterization studies, the "use" complained of. Whether or not data from those studies also provided the Defendants with useful information with which to assess their patent position is immaterial. The characterization studies are therefore exempt.

### 5. Viral Clearance Tests

■ Relying on the Defendants' internal memoranda, Amgen points to a planned series of stringent viral clearance tests that it asserts were designed to meet European regulatory standards. The Defendants state that GA–EPO was in fact exported to Scotland to be tested for viruses, and that the results of those tests were submitted to the FDA. Regardless of the stringency of European standards relative to those of the FDA, these tests were reasonably related to obtaining FDA approval. See *Intermedics*, 775 F.Supp. at 1280–81 ("it should not matter that other reasonable persons might have concluded that FDA approval could be secured even without the information in question").

### 6. Radiolabeling

■ Amgen states that the Defendants once planned to conduct radiolabeling for studies unique to Japanese regulatory requirements, but have abandoned those plans. The Defendants agree, with the added assertion that no such studies have ever been conducted. Unexecuted plans do not constitute infringement. 35 U.S.C. § 271(a); *cf. Telectronics*, 982 F.2d at 1523.

In substance, Amgen complains that the Defendants are engaged in a world-wide coordinated effort to secure regulatory approval from U.S., Japanese, and European regulators using the same package of data and clinical studies. It is Amgen's position that this piggybacking is not what Congress contemplated when establishing the section 271(e)(1) exemption, and that such dual purpose activities should not be afforded protection. To accept this position would require this Court "to read into this statute an unspoken requirement that the disclosure of information obtained during clinical trials to persons other than FDA officials, although not in itself an act of infringement, somehow 'repeals' the exemption." *Telectronics*, 982 F.2d at 1524. That is not the law. All of the activities Amgen has identified in the papers before the Court fall within the protection afforded by section 271(e)(1) because they are solely for uses reasonably related to the production of information for submission to the FDA for regulatory approval. As such, they are not infringing activities, and the Defendants are entitled to judgment.

### D. Declaratory Relief

Having concluded that there is no infringement, the Court must now consider whether it has jurisdiction to issue a declaration concerning future infringement; and, if so, whether to exercise that jurisdiction.

■ "Declarations of infringement sought by patentees against parties who will allegedly infringe in the future have been less frequently requested, but have nevertheless been allowed to proceed" in district courts. *Lang v. Pacific Marine & Supply Co. Ltd.*, 895 F.2d 761, 763 (Fed.Cir.1990) (citations

omitted).[8] The Federal Circuit in *Lang* held that such actions could be maintained "[i]f the controversy requirement is met by a sufficient allegation of immediacy and reality." *Lang*, 895 F.2d at 763. The court articulated a two-part test for determining whether there is jurisdiction:

> To meet the controversy requirement in a declaratory judgment suit by a patentee against an alleged future infringer, two elements must be present: (1) the defendant must be engaged in an activity directed toward making, selling, or using subject to an in-fringement charge under 35 U.S.C. § 271(a) (1982), or be making meaningful preparation for such activity [reality]; and (2) acts of the defendant must indicate a refusal to change the course of its actions in the face of acts by the patentee sufficient to create a reasonable apprehension that a suit will be forthcoming [immediacy].

*Lang*, 895 F.2d at 764. Even if the court determines that there is jurisdiction, the exercise of jurisdiction is discretionary with the district court. *Spectronics Corp. v. H.B. Fuller Co., Inc.*, 940 F.2d 631, 634 (Fed.Cir. 1991).

■ Amgen relies heavily on *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562 (Fed.Cir. 1997), to support the availability of declaratory judgment in this case. In *Glaxo*, the Federal Circuit upheld the district court's exercise of jurisdiction, concluding that the defendant "was systematically attempting to meet the applicable regulatory requirements while preparing to import its product." *Glaxo*, 110 F.3d at 1571. The court thus distinguished its earlier holding in *Telectronics*, in which FDA approval was "years away." 982 F.2d at 1527. In this case, there is no doubt about the Defendants' plans to market GA–EPO at the earliest opportunity, in the face of Amgen's patent claims. Nor is there any question about its immediate capacity to do so upon FDA approval. Under these circumstances, the controversy is sufficiently real and immediate to establish jurisdiction.

Even assuming that the Court has jurisdiction, however, numerous considerations militate against exercising that jurisdiction. Not only is FDA approval uncertain, but the process or the product itself may be altered during the interval in ways that are material to an infringement analysis. Any declaration issued by this Court now may be rendered moot by such alterations.

■ More important, subjecting the Defendants to an infringement litigation at present may run afoul of the Congressional policy underlying the section 271(e)(1) exemption. The purpose of the clinical trials exemption is to expedite the arrival of generic drugs on the market upon the expiration of a patent. *See* H.R.Rep. No. 98–857, pt. I at 45–46; pt. II at 8–9, *reprinted in* 1984 U.S.C.C.A.N. 2647, 2678–79, 2692–93. Prior to the enactment of the section 271(e)(1) exemption, a competing drug manufacturer had to wait until the expiration of a patent even to begin the clinical and laboratory trials that FDA approval requires, thus extending the effective life of the original patent for years. The Committee explained "the Constitution empowers Congress to grant exclusive rights to an inventory for a limited time, that limited time should be a definite time and, thereafter, immediate competition should be encouraged." *Id.* at 2679. The Federal Circuit, addressing the impact of the Act on the market for medical devices, said "[b]y permitting the testing and regulatory approval process to begin well before a controlling patent had run its course, Congress must have intended to allow competitors to be in a position to market their products as soon as it was legally permissible." *Telectronics*, 982 F.2d at 1525.

Declaratory judgment actions have the potential to discourage and hamper the very efforts that Congress sought to stimulate, by subjecting potential competitors to the same burdensome litigation that Congress sought to eliminate. *Cf. Intermedics*, 775 F.Supp. at 1289–90; *Abbott Labs. v. Zenith Labs., Inc.*, 934 F.Supp. 925, 938–39 (N.D.Ill.1995). Although it is true that Amgen seeks only a

---

**8.** It is worth noting that the action arises only under the Declaratory Judgment Act, as section 271 can in no way be construed to cover acts other than those named in the statute. *See Lang,* 895 F.2d at 765.

declaration of its rights, which would not preclude continuing exempt activities, the use of the declaratory action could easily become a tool of harassment and intimidation for use in discouraging early efforts at competition. Because the Defendants in this case will violate the law only if they step outside the protective safe harbor that Congress has created, this Court is hesitant to invade that harbor under the auspices of declaratory relief.

Nevertheless, this Court recognizes the importance of Amgen's desire to have the infringement question settled authoritatively at the earliest stage. Amgen stands to lose considerable revenues to a competing product, which it contends infringes the claims of its patents. The statutory monopoly is nowhere near expiring, and Amgen may legitimately apply to the courts to enforce that monopoly.

In the exercise of its discretion, therefore, this Court will order the remaining declaratory judgment claim administratively closed, to be reopened upon motion of either party for good cause shown. The issuance by the FDA of a product license presumptively would show good cause, since the section 271(e)(1) exemption would cease to apply. There may be, in addition, events prior to FDA approval that would constitute good cause.

Should the case be reopened, and should Amgen seek preliminary equitable relief, this Court, as is its wont, will combine the hearing on a preliminary injunction with trial on the merits. *See* Fed.R.Civ.P. 65(a)(2). Both parties ought prepare themselves for this eventuality.[9]

9. It is this Court's duty, however, to inform the parties that the District of Massachusetts, along with the District Court of the District of Columbia, the District of Delaware, the Southern District of West Virginia, the District of Wyoming, the Western District of Pennsylvania, and the Eastern District of Washington have each been targeted by the Subcommittee on Judicial Statistics of the Judicial Resources Committee of the United States Judicial Conference as candidates to have their authorized complement of district judges reduced by one active judge in each district. *See* Letter of January 21, 1998 from Hon. Patrick A. Conmy, Chair of the Subcommittee on

CONCLUSION

Because the defendants' activities fall within the section 271(e)(1) exemption, their motion for summary judgment of noninfringement is granted. The remaining motions are denied, and the matter will be administratively closed upon the terms discussed above.

SO ORDERED.

Judicial Statistics, to Hon. Joseph L. Tauro, Chief Judge of the United States District Court for the District of Massachusetts, and the unanimous opposition of all members of this Court dated April 8, 1998. While this project is still in its infancy, and while the matter is, of course, primarily the responsibility of the Congress and the President, should an active judgeship in this District be eliminated or remain unfilled, I cannot promise the prompt judicial resolution of this dispute, although the parties rightfully deserve it and the proper functioning of the nation's commerce and trading interests would seem to require it.