STATE OF MAINE

BUSINESS AND CONSUMER COURT

Cumberland, ss.

Location: Portland

DCCI, LLC                          )
                                   )
            Plaintiff,             )
                                   )
      v.                           )
                                   )          Docket No.: BCD-CV-13-65 ✔
KENDRICK PARKER                    )
                                   )
            Defendant              )
                                   )
                                   )
                                   )
                                   )

## DECISION AND JUDGMENT

This case came before the court for a jury-waived trial on August 27 and 28, 2015, at which both parties presented evidence in the form of sworn testimony and exhibits, after which the parties filed proposed findings of fact and conclusions of law. Based on the entire record, the court adopts the following findings and conclusions and renders judgment as set forth below.[1]

1. Plaintiff DCCI, LLC ("DCCI") is a limited liability company based in Oregon. Robert F. Gonzales is the managing member of DCCI. Mr. Gonzales has a longstanding interest in the genre of older, high-performance automobiles known as "muscle cars."

2. Defendant Kendrick Parker ("Parker") is a resident of Fairfield, Maine who, like Mr. Gonzales, has been a muscle car enthusiast for many years. He has bought and sold many vehicles, and has worked on restoring many of them in the garage at his residence.

---

[1] Trial of the case was delayed twice at the request of the parties, due to discovery and expert witness issues. As the numerous case management orders issued indicate, trial was set for specific dates in February 2015, and then, at the parties' request, trial was postponed to specific dates in April 2015. In April, counsel for the parties asked again that the trial be postponed, and the court agreed, setting trial for August 2015. At the trial, both counsel did a capable, efficient and effective job of presenting the evidence.

1

3. In 2006, he purchased a rare and highly sought-after muscle car model, a 1968 Plymouth GTX with a Hemi 426 engine and a 4-speed transmission ("the GTX"), one of just 217 such vehicles sold in the United States. The GTX purchased by Mr. Parker came off the assembly line on April 24, 1968. He bought it from a private seller and paid $75,000 for it. *See* Trial Exhibit (hereinafter "Tr. Ex.") 13.

4. Muscle cars from the 1960's and 1970's are extensively traded and restored by and on behalf of collectors and enthusiasts such as Messrs. Gonzales and Parker. Certain characteristics are especially valued among muscle car enthusiasts. Significant value is attached to a muscle car that has "numbers matching" parts and components, meaning the original parts and components installed when the car was assembled at the factory, as shown by coded numbers on parts and components that match the coding on the vehicle itself. Parts and components can also be "date code correct," meaning that, although the parts and components are not original to the car, they were manufactured within three to four months prior to the date on which the vehicle was assembled at the factory and thus could have been installed on the vehicle at the time of manufacture.

5. Mr. Parker's plan for the GTX was to restore it by various means, including acquiring date-code correct parts and doing much of the work himself in his home garage. Soon after acquiring the vehicle, Mr. Parker noted low oil pressure, so he replaced the oil pump, but the problem continued, so he decided the engine needed a rebuild.

6. The engine block was not original to the vehicle; instead, for reasons unknown, the original engine block had to be replaced during the warranty period, so the engine block in the GTX when Mr. Parker acquired it was a "warranty block" built in 1968, a few months after the GTX itself was built.

7. Between 2006 and 2008, Mr. Parker paid Steven Benner's engine rebuilding business to rebuild the engine in the GTX. Mr. Benner has extensive experience and expertise in engine rebuilds for muscle cars, including Chrysler Hemi products. The rebuild took about two years because Mr. Parker could afford only to pay in stages, so the work was done in stages.

8. In the course of the rebuild, it emerged that the cylinder heads were mismatched so Mr. Parker eventually purchased cylinder heads that matched the engine. The seller of the heads told him that the heads would be "date-code correct" for a GTX built in April 1968. Although this proved incorrect, because the heads dated to March 1969, not at all date-code correct for a vehicle built the year before, Mr. Parker believed that the heads he had acquired to be installed by Mr. Benner were indeed date-code correct.

9. During the engine rebuild, Mr. Benner also discovered a hole in the engine block that had been repaired with a patch weld. This "window" in the engine was likely caused by a rod connecting one of the pistons to the crankshaft detaching with sufficient centrifugal force to penetrate the engine block. After inspecting the window and the weld, Mr. Benner advised Mr. Parker that the window had been repaired competently, and that the repaired window would not affect the integrity of the engine block or the operation of the engine.

10. In March 2007, Mr. Parker had the transmission in the GTX rebuilt by Robert Eberle, who at the time operated a transmission repair facility, at a cost of about $1,100. Mr. Eberle had experience rebuilding transmissions in Hemi vehicles and other muscle cars. While working on Mr. Parker's GTX, Mr. Eberle noted that the transmission in the vehicle was date-coded to indicate it had been manufactured in November 1967. He also noted that the transmission had no Vehicle Identification Number (VIN), indicating it was a warranty replacement transmission, also known as a "Chrysler exchange" transmission, not the originally

3

installed transmission. Both Parker and his friend, Robert Thibodeau, who helped Mr. Parker work on the car at various times made the same observations.

11. In early 2011, Mr. Parker rebuilt the dashboard in the GTX. The vehicle had come with a tachometer when Mr. Parker bought it, and the internal components of the tachometer were part of the rebuild.

12. Over the years he owned the GTX, Mr. Parker purchased and restored other components, including the carburetors, which he purchased on the understanding that they were date code correct, and which he had restored. He also repainted the car so as to replicate the original paint job, as indicated on the "fender tag" for the vehicle.

13. During the period 2009-11, Mr. Parker drove the GTX both recreationally and in some local drag races, putting a total of about 500 miles on the vehicle over the time he owned it.

14. In 2011 he decided to sell the GTX to raise funds for the purchase of a camp. He advertised the vehicle on various Mopar[2] websites and on EBay. He listed the vehicle for more than he had paid for it, but over time reduced the price.

15. His advertisement read:

1968 Plymouth GTX Hemi, 57k Original Miles, Dark Green/Black, 57,000 Miles

1968 Plymouth Hemi GTX. Rare 1 of 234 4 speed. 57,000 original miles. GG1 Racing Green with White stripes this car was ordered new from Texas to go racing, Non console, 4 speed with Buddy seat, Manual drums, Manual steering, Factory Tach, Black interior, Original Fender tag, No build sheet, Previous ownership title from MI. Galen has info on car, I have been working on this GTX for 2 years Bringing it to this Level. Freshly Built July 68 Hemi Warranty, 3 months after build of car, Professionally Built and Dynoe'd at 500+ HP (solid roller) Streetable 10:5:1 Engine. Carbs are date coded correct and restored. Runs flawless. Intake, exhaust manifolds, radiator, wiper motor, Heads, all dated coded. Hemi 4 speed Tranny, freshly rebuilt and date coded, Dana rear is original to GTX with correct 3:54 gears. All sheet metal is original panel except driver side rear quarter, Paint is fresh as it had minor dings and

---

[2] Mopar is Chrysler's brand name for auto parts, but among car enthusiasts is taken to refer generically to Chrysler products.

4

scratches. Laser straight. Over 100 hrs of wet sanding and buffing, all trim is restored and shines excellent. The Dark Racing Green Looks Black at dusk. I would be interested in trading down for the right Mopar. No disappointments.

16. The advertisement is a combination of "puffery" and specific representations. Mr. Parker believed all of the specific representations in his advertisement were correct, but several were not, at least in the eyes of muscle car experts. For example, Mr. Parker thought that a carburetor made in September 1967 would qualify as "date-code correct" for his April 1968 GTX, but the experts define "date-code correct" more narrowly and consider only parts made three or four months before the vehicle to be date-code correct. Other discrepancies discovered later were that the reference to July 68 should have been to August of that year, and the 3:54 gear ratio was incorrect.

17. Sometime in 2011 or 2012, Mr. Parker's advertisements came to the attention of Mr. Gonzales, who, like Mr. Parker, was a muscle car enthusiast of long standing. Mr. Gonzales was looking for a vehicle "pretty close to showroom condition," preferably one that was numbers matching at least to some extent. Mr. Parker's advertisement on its face did not meet these criteria, and the asking price for the vehicle signaled that it was not top-quality— GTX vehicles of the same vintage that have been fully restored and are worthy of showing at national events sell for multiples more than Mr. Parker's asking price. Nonetheless, various aspects of the advertisement, such as the references to date code correct components and the engine running "flawlessly" led him to contact Mr. Parker.

18. Messrs. Parker and Gonzales communicated electronically for some time about the vehicle. During those telephone and e-mail conversations, Mr. Gonzales asked, and Mr. Parker answered, many questions about the vehicle. Mr. Parker characterized the vehicle as a "local driver," meaning that the GTX was best suited to be driven recreationally rather than restored to show level. Although Mr. Gonzales had been looking for a show car, he

5

nevertheless decided to buy the GTX, fully aware that it was not a show car and would take considerable additional work to be brought to anywhere near show-quality level. On or about February 22, 2012, DCCI entered into an agreement to purchase the GTX from Mr. Parker for $60,000.

19. The parties' agreement is memorialized in a letter drafted by Mr. Gonzales on DCCI letterhead, signed by Mr. Gonzales on behalf of DCCI and by Mr. Parker, and reading as follows:

To Whom It May Concern

This letter is to assure that both parties, Mr. Rick Parker and Mr. Robert F. Gonzales, are in agreement that check number 5334 in the amount of $5,000 is a deposit on the 1968 Plymouth GTX for $60,000 that Mr. Gonzales found online and that we have discussed over the phone. Mr. Gonzales has thirty (30) days to, either in person or by proxy, inspect the vehicle to make sure that it is numbers matching and as represented by Mr. Parker.

It is understood that if the above mentioned car does not completely check out, for any reason, then the deposit is refundable. May it also be understood that Mr. Parker agrees to the above stated terms by depositing or cashing the above mentioned check.

20. For reasons not explained, Mr. Gonzales drafted the agreement letter to suggest that the GTX was "numbers matching" (i.e., equipped with original parts) when he clearly knew it was not and had never been represented to be. When Mr. Parker brought the misstatement to his attention, Mr. Gonzales refused to correct the letter and insisted that Mr. Parker sign it as drafted, meanwhile assuring Mr. Parker that he knew the "numbers matching" reference was wrong. Later, he asked Mr. Parker twice for a receipt that misrepresented the purchase price, both of which requests Mr. Parker declined to honor.

21. To inspect the vehicle prior to making payment in full, Mr. Gonzales retained James Mott, an expert in the field of muscle car restoration, to do a thorough inspection of the vehicle. Mr. Mott initially declined the assignment because he is mainly an expert in Pontiacs

6

and not an expert on Dodge Hemis or Chrysler products, but Mt. Gonzalez told him he could not find anyone else to look at the GTX, so Mr. Mott ultimately agreed. Mott Dep. 55-56.

22.     In March 2012[3], Mr. Mott came to the Parker home in Maine, where the vehicle was garaged, and spent four hours on the inspection. Due to winter conditions, Mr. Mott did not ask to drive the vehicle, because taking the vehicle onto a public road, there likely to encounter snow and ice and salt and sand, would have undone the many hours of work Mr. Parker had invested in cleaning, painting and restoring it.

23.     Although Mr. Gonzales later claimed that Mr. Mott had told him that Mr. Parker refused to allow the car to be driven, Mr. Mott did not ask to drive the car. Mott Dep. at 45. In fact, Mr. Mott had told Mr. Gonzalez before going to Maine that he likely would not be driving the GTX, and Mr. Gonzalez seemed to understand that this was a "no-brainer . . . Wintertime in Maine, don't drive cars, classic cars, on the road." Mott Dep. at 72. However, Mr. Mott did start the car and satisfied himself that it ran smoothly with no apparent issues or problems.

24.     The inspection lasted about four hours, and Mr. Mott was allowed to do anything and everything he wanted to do during the inspection. Mott Dep. at 47.

25.     After Mr. Mott completed his inspection, he reported his findings to Mr. Gonzales in a lengthy telephone conversation, based on Mr. Mott's detailed notes, to the effect that the GTX was basically what it was stated to be in the advertisement. He also told Mr. Gonzales that, although he had not driven the car, the vehicle's engine had started and ran well. Mott Dep. at 71, 82. His overall assessment, as conveyed to Mr. Gonzales that the GTX was not worthy of being restored, but would be a good buy as a driver car—meaning a car used only for driving for pleasure. Mott Dep. at 62.

---

[3] Mr. Mott, whose telephonic deposition was admitted in lieu of his live testimony, said the inspection occurred March 7, 2012, and an itemized invoice to Mr. Gonzales, attached as a deposition exhibit, confirms that date. Mott. Dep. at 23; Mott Dep. Ex. 14, p. 1.

26. Mr. Gonzales had hopes of being able to restore the GTX to show car level, and Mr. Mott's report made it clear to him that the vehicle was nowhere near that level of quality. However, Mr. Gonzales arranged for the purchase to be completed by having DCCI pay the balance of the purchase price and arranging for the vehicle to be shipped to Oregon. The purchase was made in the name of DCCI, LLC, as an "investment."

27. DCCI paid Mr. Parker an additional $1,000 for wheels and tires. *See* Tr. Ex. 15.

28. After the vehicle arrived, Mr. Gonzales drove it several times. He contacted Mr. Parker and told him of driving the vehicle with his daughter, with no mention of any problems.

29. However, soon after receiving the vehicle, Mr. Gonzales also began complaining about it in e-mail messages to Mr. Parker:

- An email chain beginning April 30 and continuing into May 1 included complaints by Mr. Gonzalez about a leak in the trunk and about problems with the transmission second gear. Mr. Parker denied knowing about a trunk leak, because he had never gotten the car wet, and said the transmission never popped out of second gear when he drove it. Tr. Ex. 18

- A May 1 email message asked Mr. Parker for confirmation that the GTX had an odometer reading of 57,000 miles, as advertised. *See* Tr. Ex. 17. Mr. Parker responded the same day, pointing out he had sent a picture of the odometer when it read 57,000, and also had sent an explanation about why the odometer's current reading was 3300 miles.

- A May 23 email message from Mr. Gonzales reiterates the complaints about the trunk leak and the transmission, and adds a complaint about a distributor cap being painted over. Tr. Ex. 19. The message also says that "the Vehicle is on [its] way to Sacramento to be completely taken apart to the frame." This statement was untrue.

8

- A May 24 message repeated the complaint about the distributor cap and the odometer reading, and added complaints about several dash instruments—radio, the tachometer, the fuel meter—and the fuel sender connector not being restored. Tr. Ex. 40. This message also claims that Mr. Mott told Mr. Gonzales that he was not permitted to drive the car, a point later contradicted by both Mr. Mott and Mr. Parker. *See id.* To this, Mr. Parker responded by pointing out that he had sent a receipt showing he had paid $800 to have the dash instruments restored and denying that he had refused to allow Mr. Mott to drive the vehicle.

- A May 29 message adding complaints about the speedometer and the dash not being as Mr. Gonzales expected, and also telling Mr. Parker that Mr. Mott had told Mr. Gonzales that Mr. Parker would not let Mr. Mott drive the vehicle. Tr. Ex. 4-12, 41. Mr. Parker denied these assertions. *See id.*

- The last Gonzales to Parker email message in the record is one from July 5, 2012, in which Mr. Gonzales claimed that "the car has now been completely disassembled"—another untrue statement—and threatening civil action and possible criminal prosecution. Tr. Ex. 42.

30. Mr. Parker had stopped responding to Mr. Gonzales's email messages sometime previously.

31. There are two features of Mr. Gonzales's email messages that merit note:

- The first is that, at no point did Mr. Gonzalez ask for his money back or for Mr. Parker to take back the vehicle. In fact, during his deposition, Mr. Gonzalez was asked why he had not demanded his money back given concerns he was raising in

9

e-mails sent around April 30 and May 1, 2012 (in the record as Trial Exhibit 18) and he characterized the concerns as "a minor deal." Gonzalez Dep. at 153.[4]

- The second noteworthy aspect of the April to July email messages is that none of Mr. Gonzales's complaints mentions any problem with the engine or with how the car ran, apart from the issue of the transmission popping out of second gear.

32. Mr. Gonzalez continued driving the GTX from time to time during the summer of 2012. Late in July 2012[5], for example, while James Mott was in Oregon for a visit, Mr. Gonzales took James Mott for a drive in the GTX. They took turns driving for a total of about a half hour. Mott Dep. at 26. The transmission popped out of gear on occasion, but even so Mr. Mott enjoyed driving the GTX. Mott Dep. at 27.

33. During Mr. Mott's July 2012 visit, Mr. Gonzalez voiced disappointment with the GTX to Mr. Mott, but most of what Mr. Gonzalez was complaining about were things Mr. Mott had already noted in his inspection and had explained to Mr. Gonzalez, before Mr. Gonzalez decided to purchase the vehicle. Mott Dep. at 30-31.

34. Sometime in the summer or fall of 2012, Mr. Gonzalez arranged for Galen Govier, a nationally recognized expert on Mopar vehicles built between 1962 and 1980, to perform an inspection of the GTX.

35. Mr. Govier performed his initial inspection in October 2012.

36. As a result of his October 2012 inspection, Mr. Govier initially gave the GTX a rating of 2.6 on a 1 to 6 scale, describing the GTX as "A good amateur restoration. Is supposed to be all date coded correct but is not. 1 of about 217 -4 Speeds built for and sold new in the U.S.A. A #2 car with many incorrect parts." Tr. Ex. 63 at p. 005073a.

---

[4] In a May 2014 email message to Mr. Mott, Mr. Gonzales acknowledged that "[t]he transmission regardless [of] whether it is date code correct or not has little impact on vehicle value." Tr. Ex. 56.

[5] Mr. Mott's itemized invoice to Mr. Gonzales indicates he was picking up a car during the period July 28-31, 2013. *See* Mott Dep. Ex. 14, p. 2.

37. According to Mr. Govier's rating scale, a rating of 1 represents an excellent vehicle—a vehicle restored to "maximum professional standards" and worthy of being shown nationally—and a rating of 6 represents a "parts car"—a vehicle so weathered, wrecked or stripped as to be of value only for any salvageable parts.

38. The 2.6 rating he initially assigned to the GTX placed the GTX between Fine—"Well-restored or a combination of superior restoration and excellent original"—and Very Good/Average—"a good amateur restoration, all presentable and serviceable inside and out."

39. At some point,[6] Mr. Govier downgraded the GTX to a 3.5 rating, describing it as "an amateur restoration at most." put the GTX between Average and Fair—meaning somewhere between "a good amateur restoration" and a "drivable vehicle needing no or only minor work to be functional." Tr. Ex. 63 at p. 5075. Later, as a result of inspecting the GTX again during the spring of 2013, Mr. Govier downgraded his rating a second time to 4.5, meaning between 4—"a drivable vehicle needed no or only minor work to be functional"—and 5—a vehicle "need[ing] complete restoration of body, chassis and interior." *See* Tr. Ex. 10A. He revised his characterization of the GTX to "a very poor amateur restoration at most."

40. At some point, Mr. Gonzalez directed that the GTX be entirely disassembled. When the disassembly occurred is not clear from the record, but it apparently began before Mr. Govier's second inspection of the vehicle in the spring of 2013 and was in progress when he came to DCCI's facility to perform that inspection.

41. The disassembly was done by employees of DCCI in the garage that DCCI maintains to service its company vehicles. Mr. Gonzalez did not supervise the disassembly. The record does not indicate whether the DCCI employees who did the work had any experience, expertise or qualifications relevant to disassembling a classic car.

---

[6] All of Mr. Govier's three different evaluations bear the same date—October 30, 2012, so it is unclear when either of the downgrades in rating actually occurred.

11

42. At some point, the transmission that had been in the GTX when it was shipped to Oregon was removed and replaced with a transmission from another vehicle. Mr. Eberle, Mr. Parker and Mr. Thibodeau all described the transmission as being different from the one Mr. Govier reviewed, and Mr. Mott testified that Mr. Gonzales had given him transmission information on the GTX different from what Mr. Govier had reported. Mott Dep. 89.

43. How, when and why the substitution in transmission occurred is unclear—one inference that might explain the mystery is that Mr. Gonzalez had the transmission replaced in 2012 because the one that came with the car was popping out of gear, but this is only a reasonable possibility. Mr. Gonzales neither acknowledged nor denied replacing the transmission.

44. ` In 2013, Mr. Gonzales also decided to strip off all of the paint on the body of the vehicle, exposing bare metal. Again, the record is silent on who did the work or what, if any, expertise, whoever did the work brought to the task. It became apparent as a result of removing the paint that the vehicle had body rust—a fact that was not apparent to anyone until after all the paint had been removed. None of the various emails from Mr. Gonzales to Mr. Parker mentioned rust as a problem.

45. During his inspection Mr. Mott had queried Mr. Parker about whether the GTX had any rust, and Mr. Parker said that, to his knowledge, the car had never had any rust. Mott Dep. 33. The reason Mr. Mott had to rely on Mr. Parker's word was that the existence of rust underneath paint is not apparent unless the vehicle is stripped of paint. Mr. Parker had never stripped all of the paint off the vehicle, and there is no specific evidence indicating that he knew or should have had any more knowledge about rust on the vehicle than Mr. Mott, Mr. Govier, Mr. Gonzales or any of the other people who examined the GTX prior to it being stripped of paint down to the metal.

12

46.     During his two inspections, Mr. Govier found, among other things:

- The heads were not date code correct as advertised, because they dated to March 1969, nearly a year after the GTX had been built.

- The rear carburetor was not date code correct, because it dated to September 1967, seven months before the vehicle was built and therefore outside the 3-4 month window for date code correct parts and components. Mr. Govier determined that the front carburetor was date code correct.

- The transmission had not been rebuilt and was not date code correct as advertised. However, the transmission he evaluated was evidently not the one that was in the car when Mr. Parker had it shipped to Mr. Gonzales in Oregon.

- The tachometer was not a factory-installed tachometer.

- The car had rust and non-original metal in more than one place as represented and advertised. Mr. Govier made this finding during his second inspection, after the vehicle had been stripped of paint, not during his first inspection.

47.     At trial, Mr. Parker did not challenge any of these conclusions. However, the transmission Mr. Govier examined was not the one he had sold to DCCI. Also, the heads were sold to Mr. Parker as date code correct and he had advertised them as such on the assumption that they were. His explanation as to the rear carburetor was similar. His mischaracterization of parts being date code correct also stemmed from a different, possibly incorrect, understanding of what the term "date code correct" means. Mr. Parker appears to have thought the period that defines what is "date code correct" is longer than the 3-4 months Mr. Govier and other experts use in applying the term.

48.     Mr. Parker thought the tachometer was from the factory, and Mr. Govier's reasons for determining it was not factory-installed, while valid, were so arcane as to cause Mr.

13

Parker's mistaken assumption to seem quite reasonable. Mr. Parker also acknowledged the discovery of rust on the GTX body but maintained that he had no knowledge of any rust as of when he sold the vehicle.

49. In June 2013, Mr. Gonzalez arranged to have the engine shipped to Dennis Aldridge, a recognized expert in the field of muscle car engine rebuilding who has over 50 years of experience in rebuilding muscle car engines including experience with NASCAR engines. Mr. Aldridge made a detailed examination of the engine. He determined that the engine provided to him by Mr. Gonzalez had significant damage. He said the engine showed signs of wear and tear not consistent with running "flawless," or having been "freshly rebuilt" and "professionally" as advertised.

50. Mr. Govier initially valued the vehicle at about $30,000 but he downgraded his estimate as problems and issues emerged as a result of his own and Mr. Aldridge's inspections, and also as a result of the discovery of rust after the paint had been stripped down to metal. At Mr. Gonzales's request, Mr. Govier prepared and ran an advertisement for sale of the GTX, disassembled, on various MOPAR websites. *See* Tr. Ex. 24. The advertisement disclosed that all of the known issues and problems with the vehicle. There were no takers at a $21,000 asking price, or even lower. Mr. Govier's ultimate opinion of the vehicle's value, presumably disassembled, was that it is worth no more than $13,000.

51. DCCI's five-count Amended Complaint pleaded claims of fraud (Count I), negligent misrepresentation (Count II), breach of contract (Count III), breach of warranty of fitness for particular purpose (Count IV), and breach of express warranty (Count V). In a previous ruling on Mr. Parker's Motion for Summary Judgment, the court granted summary judgment to Mr. Parker on Count II, the negligent misrepresentation count.

14

52. DCCI has the burden of proof on all of its claims, meaning that it has to prove liability, causation and damages. The Law Court has said,

> "A defendant is liable for fraud if the plaintiff establishes the following elements by clear and convincing evidence: [The defendant (1) makes a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance upon it, and (5) the plaintiff justifiably relies upon the representation as true and acts upon it to his damage. When clear and convincing evidence is required, plaintiffs bear the burden of persuasion to place in the ultimate factfinder an abiding conviction that the truth of [their factual contentions are highly probable.

*St. Francis De Sales Fed. Credit Union v. Sun Ins. Co.*, 2002 ME 127, ¶ 26, 818 A.2d 995, 1003 (citations and quotations omitted).

53. Based on this standard, DCCI has not proved fraud on the part of Mr. Parker. His advertisement did contain outright false statements as to material facts, specifically that the heads and carburetors were date code correct, but he believed that they were date code correct, based on what he had been told when he purchased them. Also, as noted, his understanding of what "date code correct" meant was broader than Mr. Govier's.

54. His other statements in the advertisement were not objectively false as to material facts. Such as the engine running "flawlessly" and having been "freshly" built and "professionally" rebuilt are subjective terms, and it has not been shown to a high probability that they were false and that he knew they were false.

55. Other incorrect statements in the advertisement were immaterial. For example, his advertisement also said that the engine dated to July 1968 when in fact it was built in August 1968, but this was not a material error, and he believed that the July date was correct. The advertisement stated the GTX was one of only 234 such vehicles, but Mr. Govier determined it was even rarer—one of 217. Again, there is no evidence that this was anything other than a mistake on Mr. Parker's part.

15

56. As to the rust problem, nothing in the advertisement specifically promises or warrants that the GTX had no body rust. Furthermore, the evidence did not establish that Mr. Parker knew or had reason to know of rust. His statement to Mr. Mott that, to his knowledge, the car did not have rust seems especially credible in light of the fact that no one who examined the car before and after DCCI purchased it detected a rust problem until the paint was stripped to metal, a step Mr. Parker had never taken.

57. Judgment on Count I will be granted to Defendant Kendrick Parker.

58. On the other hand, DCCI has proved that Mr. Parker is liable at least to some extent for breach of contract, breach of express warranty and breach of implied warranty of fitness for particular purpose. Mr. Parker's state of mind is relevant to DCCI's fraud claim, but not to its breach of contract and warranty claims. Mr. Parker contracted with DCCI to sell the car as advertised, with minor corrections and clarifications made during the conversations between Mr. Parker and Mr. Gonzales. The same advertisement serves as an express warranty as to the parts described in the advertisement being date code correct. Mr. Parker clearly knew that DCCI was purchasing the car for the particular purpose of potential use as a classic driver car and for restoration.

59. The fact that the GTX did not have date code correct heads and rear carburetor, and did not have a factory tachometer, as advertised establishes all three types of breach.

60. The analysis now turns to what damages should be awarded. DCCI's damages claim is for the benefit of the bargain, as permitted by the Maine Uniform Commercial Code, 11 M.R.S. § 2-714(2). DCCI has the burden on proving damages as well as liability. Proof of damages, at least in this case, also implicates issues of causation, because DCCI is entitled only to those damages that it establishes were the result of a breach of contract or express or implied warranty.

16

61. DCCI's position is that Mr. Parker's breaches of contract and warranty extend to the entire vehicle. In its proposed findings, DCCI advances two alternative measures of its benefit of the bargain damages. First, it argues that the car would have been worth $100,000 if it had been as represented and in fact it was worth about $13,000, meaning that its damages are the $87,000 difference between the two values. Alternatively, it argues that its damages are measured by the difference between the purchase price of $60,000 and its actual value of $13,000.

62. The problem with the first proposed measure is that, by the time DCCI bought the car, it was clear that the vehicle was not worth $100,000. Mr. Gonzales testified to thinking DCCI was getting a very good deal, but if that he is what he thought, it was a fantasy. Neither the advertisement itself nor Mr. Mott's assessment supported that view—it should have been clear that the vehicle was a driver car, not a show car.

63. The second proposed measure requires more consideration, but the court concludes that DCCI has failed to prove the difference in value between the $60,000 purchase price and the actual value of the vehicle at the time of sale. The primary reason for the failure in proof is with the latter number, meaning that the evidence fails to establish to a preponderance that the condition of the car when it was examined and valued by Mr. Govier and examined by Mr. Aldridge was essentially the same as it was when the car was sold to DCCI.

64. The substitution of another transmission for the one in the vehicle when it was sold defeats any claim of DCCI relating to transmission problems. Whatever the problems with second gear in the original transmission were, they were not documented through Mr. Govier because he examined a different transmission.

65. The unexplained installation of a different transmission also raises doubt as to the reliability of DCCI's evidence as to other alleged defects in the vehicle. The court has no reason to question Mr. Govier's conclusions regarding the vehicle as a whole or Mr. Aldridge's conclusions regarding the state of the engine—both of them are nationally recognized experts in the field and both presented thorough and well-supported analyses. Mr. Govier's conclusions did evolve over time, causing his rating of the GTX to decline, but this can be explained by the fact that he was advised of more problems—with the engine and with rust, for example—than were apparent during his first inspection in October 2012. However, both experts were simply analyzing and reporting what they observed. Neither could speak definitively to the condition of the GTX at the time it was sold and shipped to Mr. Gonzales, or to what happened to the GTX between the time it was sold and the time they inspected it.

66. DCCI's position regarding the engine is that it was in essentially the same condition when Mr. Aldridge evaluated it as when Mr. Parker sold it to DCCI. However, that is just an assumption and there is substantial evidence calling that premise into question. DCCI's claim regarding the engine hinges on the statement in Mr. Parker's advertisement that the engine "runs flawlessly" and was professionally rebuilt and "dynoe'd." The latter statement is true—Mr. Benner is a professional rebuilder of engines and did test the engine with a dynamometer. The reference to the engine running "flawlessly" is at least in part puffery, and can best be taken as meaning that the engine runs very well with no evident issues. This is essentially what Mr. Mott concluded when he inspected the car and started the engine. Apart from Mr. Aldridge's inspection five years later, there is no evidence that calls into question the competence and quality of Mr. Benner's work.

67. Mr. Parker acknowledged drag racing the vehicle after the rebuild, and DCCI points to the drag racing as potentially causing, or at least contributing to the problems

18

observed by Mr. Aldridge. However, substantial evidence undercuts this hypothesis as well as the hypothesis about the rebuild. The engine ran well when Mr. Mott started the GTX on March 7, 2012. Mr. Gonzales reported no problems when he drove the car with his daughter soon after it arrived in Oregon. It is also quite significant that none of the many complaints about the vehicle contained in the email messages Mr. Gonzales sent to Mr. Parker between April and July, 2012 mentioned any problems with the engine itself or, other than the transmission second gear, any problems with how the vehicle drove. It drove well other than popping out of gear, when Mr. Mott and Mr. Gonzales drove it during Mr. Mott's visit to Oregon in late July 2012.

68. Another significant factor in the court's assessment of the evidence—not just as to the engine but as to DCCI's claims overall—is Mr. Gonzales's testimony. A major premise of DCCI's case—that the GTX was in the same condition when Mr. Govier and Mr. Aldridge saw it as it was when DCCI purchased it—hinges almost entirely on Mr. Gonzales's testimony. Except for Mr. Mott, who drove the vehicle in July 2012, Mr. Gonzales was the only witness who testified about he did with the GTX during the first six months after it arrived in Oregon.

69. However, Mr. Gonzales' testimony was not very credible. He asked Mr. Parker for a false bill of sale. His emails to Mr. Parker contained several outright fabrications—the statements about the car being on its way to Sacramento and later completely disassembled being an example. He gave a false answer under oath to an interrogatory question about his criminal history and, when confronted at trial, gave what can only be called an implausible explanation.[7] Other aspects of Mr. Gonzales testimony were persuasively contradicted by

---

[7] The interrogatory question asked: Please state whether you have ever been indicted or pled guilty to a felony or crime of moral turpitude." Tr. Ex. 11, p. 2. The answer given was, "I have not been indicted or pled to any such crime." *Id.* In fact, Mr. Gonzales has been indicted for and convicted of a felony offense. His explanation for the false answer was that he thought the question applied to DCCI, not to him. However, the answer to the first interrogatory, which asked, "Please identify yourself . . .," lists his own name and job title.

other evidence. For example, he claimed to have learned, only after the sale, that Mr. Mott had not driven the car during his 4-hour inspection. Mr. Gonzales's May 29, 2012 email to Mr. Parker says, "If Jim had of informed me of this I would have told him to turn around and send me an invoice." Tr. Ex. 4-12. But Mr. Gonzales had a lengthy telephone conversation with Mr. Mott right after the inspection and before DCCI purchased the car. The idea that he believed Mr. Mott would be driving the car and yet never asked about it during that conversation is absurd. The truth, it can be inferred, is that Mr. Gonzales knew and understood, before the inspection took place, that Mr. Mott would not be driving the car, because it was a "no-brainer," to quote Mr. Mott, that a classic car would not and should not be driven during the Maine winter. Another discrepancy has to do with how many miles Mr. Gonzales actually drove the GTX after DCCI bought it. In a May 1, 2012 email message to Mr. Gonzales, sent in response to a question about the odometer, Mr. Parker recorded the GTX's odometer as reading 3300, at the time of sale. Tr. Ex. 4-4. The odometer read 3684 when Mr. Govier saw the vehicle. Tr. Ex. 10A. Yet Mr. Gonzales testified at trial that he had only driven the GTX a total of 50-100 miles. These and other discrepancies, along with the unexplained substitution of a different transmission for the one that came with the GTX, undermine the strength of DCCI's proof.

70. Thus, the court concludes that DCCI has failed to prove that it is entitled to damages measured in terms of the value of the vehicle as a whole. Mr. Parker did not promise or warrant the GTX to be anything more than a local driver car, and that is what it was.

71. However, certain components of the vehicle were admittedly not consistent with what was represented, and the analysis shifts to those.

72. Many of DCCI's specific concerns were not proved in terms of being a breach of contract or a breach of express or implied warranty:

20

- Body rust: the advertisement does not promise or warrant that the vehicle was free of body rust, and Mr. Parker, when asked by Mr. Mott, said, truthfully, that there was no rust as far as he knew.

- The engine: the advertisement said the engine runs "flawlessly," meaning very well, and evidently it did when Mr. Mott started it. As noted above, DCCI failed to establish that the engine when examined by Mr. Aldridge was in substantially the same condition as when DCCI purchased the GTX. Moreover, DCCI did not establish that the engine block was not a "warranty block." There was a confusing conflict in the evidence on that point. Mr. Govier testified at trial that it is not a warranty block, although his initial report seems to say it is. *See* Tr. Ex. 10A-5. Mr. Benner testified that it is. The question is resolved against DCCI because it has the burden of persuasion to show the block was not what it was purported to be.

- The transmission that was on the vehicle when sold had indeed been rebuilt as indicated in the advertisement. Even Mr. Gonzales deemed the transmission issues to be "minor"

- Miscellaneous: issues such as the trunk leak, the painted over distributor cap, the dash instruments (speedometer, fuel meter, "sender") and the dyed buddy seat were not shown to be breaches of contract or warranty, because nothing in the advertisement addresses them. The evidence did not indicate that Mr. Parker was aware of either the trunk leak or the dye job on the buddy seat prior to the sale.

73.     DCCI's damages as to some areas that were specifically mentioned in the advertisement—the non-factory tachometer and the gear ratio discrepancy for example—were not quantified in terms of either cost of repair or difference in value. Although the rear carburetor on the GTX was not date code correct as represented, the record does not contain a

21

sufficient basis, such as evidence of the cost of a date code correct carburetor, on which the court could award damages. Moreover, even though the rear carburetor is not date correct for the GTX, it is date code correct for vehicles built 3-4 months after the date of manufacture for the carburetor and thus presumably has some resale value. For that reason as well, DCCI has not proved damages attributable to the rear carburetor not being date code correct.

74. The one area where the court finds and concludes that DCCI has proved both liability and damages is for the non-date code correct heads, which Mr. Govier determined were manufactured in March 1969, almost a year after the GTX was built. One of the receipts in the record indicates that Mr. Parker purchased the heads in 2008 for $1,900. Tr. Ex. 16 at p. 9.[8] In the absence of better evidence of the cost of compatible heads manufactured during the correct 3-4 month period in early 1968, the court accepts this as the cost of purchasing date code correct heads. As with the carburetors, the heads theoretically have some resale value because they would be date code correct for vehicles built from March 1969 to July 1969, but there is also evidence that one or both heads leak coolant, so no reduction for resale value is justified.

75. Accordingly, DCCI is awarded damages of $1,900 for breach of contract and express and implied warranty. Regarding costs, there is a good argument for assessing costs against DCCI, because it failed to prevail on nearly all of its claims. On the other hand, DCCI did prove that the GTX did not conform in multiple respects with the advertisement. Even though it did not prove damages as a result of the nonconformities, Mr. Parker cannot be said to have prevailed for purposes of obtaining an award of costs.

IT IS HEREBY ORDERED AS FOLLOWS:

1. Judgment on Count I (fraud) is hereby awarded to Defendant Kendrick Parker.

---

[8] Trial Exhibit 16 at page 9 shows two receipts for cylinder heads, one from 2006 and the other from 2008. The court infers that the later receipt is for the heads that were in the vehicle.

2. Judgment on Counts III (breach of contract), IV (breach of warranty of fitness for particular purpose) and V (breach of express warranty) is hereby awarded to Plaintiff DCCI, LLC. Plaintiff is awarded damages of $1,900 on each of the three counts, but since the awards are for the same dollar damages, the net judgment is for $1,900, with prejudgment and post judgment interest.

3. Each party shall bear its own costs.

Pursuant to M.R. Civ. P. 79(a), the Clerk shall incorporate this order into the docket by reference.

Dated September 29, 2015

A. M. Horton
Justice, Business and Consumer Court

Entered on the Docket: 9-30-15
Copies sent via Mail ___ Electronically ✓

**DCCI, LLC v. Kendrick Parker**

**BCD-CV-2013-65**


**DCCI, LLC**

    **Plaintiff**

    Counsel:                             Walter McKee, Esq.
                                         McKee Billings, LLC PA
                                       133 State Street
                                       Augusta, ME 04330


**Kendrick Parker**

    **Defendant**

    Counsel:                             Paul Sumberg, Esq.
                                         263 Water Street
                                       PO Box 9
                                       Skowhegan, ME 04976-0009

STATE OF MAINE                                    BUSINESS AND CONSUMER COURT

Cumberland, ss                                                    Location: Portland


DCCI, LLC                              )
                                       )
                                       )
              Plaintiff,               )
                                       )
       v.                              )          Docket No.: BCD-CV-13-65 ✓
                                       )
KENDRICK PARKER                        )
                                       )
              Defendant                )
                                       )
                                       )
                                       )

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to M.R. Civ. P. 56, Defendant Kendrick Parker has filed a Motion for Summary Judgment. Plaintiff DCCI, LLC ["DCCI"] opposes the Motion. The court elects to decide the Motion without oral argument. *See* M.R. Civ. P. 7(b)(7).

### Factual Background

DCCI is a limited liability company operating in Oregon, and Robert Gonzales is its managing member and principal. Kendrick Parker is an individual resident of Fairfield, Somerset County, Maine. Mr. Parker has had a longstanding interest in the category of automobiles known as "muscle cars," and over the years has owned as many as 50 different muscle cars.

In 2006, Mr. Parker purchased a 1968 Plymouth Hemi GTX automobile ["the GTX"], which falls toward the high end of the muscle car category. Mr. Parker installed a new engine and clutch in the GTX and invested considerable time and resources in restoring it, including obtaining various "date-coded" parts manufactured in or around 1968, the vehicle's year of manufacture, thereby enhancing the GTX's value. He also raced it a number of times.

1

In 2011, he decided to sell the GTX in order to raise money to buy a camp, and began to advertise the GTX for sale in online muscle car market media. Mr. Gonzales saw one of the online advertisements, and decided to purchase the vehicle through DCCI, subject to an inspection. DCCI and Parker negotiated a price of $60,000, substantially less than the originally advertised price of $85,000. The parties' contract is memorialized in a letter drafted by Mr. Gonzales on DCCI letterhead, signed by Mr. Gonzales on behalf of DCCI and by Mr. Parker, and reading as follows:

To Whom It May Concern

This letter is to assure that both parties, Mr. Rick Parker and Mr. Robert F. Gonzalez, are in agreement that check number 5334 in the amount of $5,000 is a deposit on the 1968 Plymouth GTX for $60,000 that Mr. Gonzalez found online and that we have discussed over the phone. Mr. Gonzalez has thirty (30) days to, either in person or by proxy, inspect the vehicle to make sure that it is numbers matching and as represented by Mr. Parker.

It is understood that if the above mentioned car does not completely check out, for any reason, then the deposit is refundable. May it also be understood that Mr. Parker agrees to the above stated terms by depositing or cashing the above mentioned check.

Consistent with the letter, DCCI sent a $5,000 deposit to hold the vehicle, and retained a person named James Mott to inspect the GTX at Mr. Parker's premises. On February 23, 2012, Mr. Mott spent about four hours inspecting the vehicle. His inspection did not include a test drive for reasons that appear to be disputed. DCCI claims Mr. Parker refused to allow it; Mr. Parker denies that, and contends that winter conditions precluded a test drive.

In any event, after the inspection, DCCI sent the balance of the purchase price to Mr. Parker via wire transfer March 19, 2012, and the vehicle was shipped West for delivery to DCCI. According to Mr. Parker, Mr. Gonzales initially expressed satisfaction with the GTX during a telephone conversation, but sometime in late April or early May 2012 he began contacting Mr. Parker via email regarding what he said were various problems with the

2

vehicle, including features that were not as represented in Mr. Parker's advertisement. None of Mr. Gonzales's email message submitted into the summary judgment record appears to request any specific relief in terms of rescission or money damages. Eventually Mr. Parker stopped responding to Mr. Gonzales' email messages, the last of which, according to Mr. Gonzales, was sent in July 2012, threatening criminal charges. After that, there appears to have been a lapse in communication until this action was filed in 2013.

DCCI's five-count Amended Complaint pleads claims of fraud (Count I), negligent misrepresentation (Count II), breach of contract (Count III), breach of warranty of fitness for particular purpose (Count IV), and breach of express warranty (Count V).

Defendant Parker seeks summary judgment on two somewhat narrow grounds. First, he claims that DCCI failed to give him timely notice of breach as required by the Maine Uniform Commercial Code (UCC), 11 M.R.S. § 2-607(3), barring DCCI from any remedy on Counts III-V of the Amended Complaint. Second, he asserts that DCCI's tort claims in Counts I and II are barred by the economic loss doctrine.

## Analysis

### I. Standard of Review

When a party files a motion for summary judgment, the court considers the parties' statements of material facts and any reasonable inferences that a fact-finder may draw from them, to determine whether the moving party is entitle to judgment as a matter of law. M.R. Civ. P. 56; *see Curtis v. Porter*, 2001 ME 158, ¶ 9, 784 A.2d 18. A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . . show that there is no genuine issue as to any material fact set forth" in the parties' statements of material facts and "that [the] party is

3

entitled to a judgment as a matter of law." M.R. Civ. P. 56(c); *accord Beal v. Allstate Ins. Co.*, 2010 ME 20, ¶ 11, 989 A.2d 733.

A party wishing to avoid summary judgment must present a prima facie case for each element of the claim or defense that is asserted against it. *See Reliance Nat'l Indem. v. Knowles Indus. Svcs.*, 2005 ME 29, ¶ 9, 868 A.2d 220. In addition to "If material facts are disputed, the dispute must be resolved through fact-finding." *Arrow Fastener Co. v. Wrabacon, Inc.*, 2007 ME 34, ¶ 18, 917 A.2d 123 (quotation marks omitted). A factual issue is genuine when there is sufficient supporting evidence for the claimed fact that would require a fact-finder to choose between competing versions of the facts at trial. *See Inkel v. Livingston*, 2005 ME 42, ¶ 4, 869 A.2d 745.

II.     The Issue of Notice of Breach

The parties appear to agree that the GTX is a "good" for purposes of rendering Article 2 of the Maine UCC applicable to the sales transaction, and thus that at least DCCI's claims for breach of contract and breach of express warranty and implied warranty of fitness in Counts III-V of the Amended Complaint are governed by Article 2.

The undisputed facts indicate that DCCI accepted the GTX for purposes of section 2-606 of the Maine UCC after arranging to have it inspected. Mr. Parker further contends, correctly in the court's view, that the lack of any indication in the factual record that DCCI revoked or attempted to revoke acceptance means that its Article 2 remedies are limited to damages. Lastly, Mr. Parker contends that DCCI failed to give him the notice of breach mandated by Article 2, and that is the basis on which he seeks summary judgment on DCCI's contract and warranty claims.

Section 2-607(3) of the Maine Uniform Commercial Code provides in part: "

3. Where a tender [by the seller] has been accepted,

4

(a). The buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.

The requirement of notice under section 2-607(3)(a) is mandatory, and when the issue of compliance with section 2-607(3) is raised, the burden is on the buyer to prove compliance. *See generally* William H. Henning and William H. Lawrence, *A Unified Rationale for Section 2-607(3)(a) Notification*, 46 SAN DIEGO L. REV. 573 (2009). Whether requisite notice was given is a mixed question of law and fact, the existence, timing and extent of notice being factual questions, and the sufficiency of notice in light of the statutory requirement being a legal question. *See K & M Joint Venture v. Smith International, Inc.*, 669 F.2d 1106, 1111 (6th Cir. 1982).

The commentators to the Uniform Commercial Code have explained the section 2-607(3)(a) notice requirement as follows:

> The time of notification is to be determined by applying commercial standards to a merchant buyer. 'A reasonable time' for notification from a retail customer is to be judged by different standards so that in his case it will be extended, for the rule of requiring notification is designated to defeat commercial bad faith, not to deprive a good faith customer of his remedy.

> The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defect upon rejection (Section 2-605). Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.

> Uniform L. Ann., UCC 2-607, cmt. 4.

In a pre-UCC decision, Judge Learned Hand observed, "The notice 'of the breach' required is not of the facts, which the seller presumably knows quite as well as, if not better than, the buyer, but of buyer's claim that they constitute a breach. The purpose of the notice is to advise the seller that he must meet a claim for damages, as to which, rightly or wrongly, the law requires that he shall have early warning." *American Mfg. Co. v. United States Shipping*

5

*Board E. F. Corp.*, 7 F.2d 565, 566 (2d Cir. 1925) (L. Hand, J.). There is no formulaic recipe for sufficiency of notice for purposes of section 2-607(3)(a). Rather, "the critical question [is] whether the seller had been informed that the buyer considered him to be in breach." *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 972 (5th Cir. 1976).

The facts of record here indicate that within days or weeks of receiving the GTX (the exact date on which it was delivered to DCCI being unclear), DCCI through Mr. Gonzales notified Mr. Parker of various problems with the GTX. Although Mr. Gonzales's email messages do not contain any formal notice of breach, a fair reading of the messages leaves the inescapable impression that DCCI through Mr. Gonzales not only considered the GTX not to be as represented, but also considered Mr. Parker to have misstated the condition of the GTX in the online advertisement that kindled Mr. Gonzales's interest in the car.

The court agrees with DCCI that these facts, as well as the fact that neither DCCI nor Mr. Parker appears to be a "merchant" in the business of buying and selling muscle cars, serve to distinguish this case from the case mainly relied on by Mr. Parker, *M.K. Associates v. Stowell Products, Inc.*, 697 F. Supp. 20, 21-22 (D. Me. 1988). Unlike the buyer in *M.K. Associates*, there is evidence in the present record to support a finding that Mr. Gonzales told Mr. Parker within days or weeks of receiving delivery that he believed the GTX was not as represented in what he considered to be material ways, and that Mr. Parker had misled him about the vehicle. The literal word "breach" was not used, but a fair reading of Mr. Gonzales's messages leaves little room for doubt about their import.

The fact that DCCI inspected the vehicle before completing the purchase and taking delivery has obvious implications for the merits of its claim, but the court is not prepared to declare notice to Mr. Parker under section 2-607 insufficient as a matter of law on the present record, and thus will deny Mr. Parker's motion for summary judgment on this ground. On the

6

other hand, the court is also not rendering summary judgment against Mr. Parker on this issue. This Order concludes only that Mr. Parker has not shown he is entitled to judgment as a matter of law on the legal issue of sufficiency of notice.

The reason why the court is not in a position to render summary judgment for either party on the sufficiency issue is that the resolution of the issue may depend in part on a comparison between what was asserted in the notice given and what breach or breaches are actually proved at trial. Thus, the burden at trial remains on DCCI to prove the sufficiency of notice.

III. The Economic Loss Issue

The Maine Law Court unequivocally adopted the economic loss doctrine in *Oceanside at Pine Point Condominium Owners Assn. v. Peachtree Doors*, 659 A.2d 267 (Me. 1995). In *Peachtree*, the Law Court defined economic loss as "damages for inadequate value, costs of repair and replacement of defective product, or consequent loss of profits —without claim of personal injury or damage to other property." *Id.* at 270 n.4 (quoting *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 449 (Ill. 1982)). The court noted that, absent evidence of personal injury or property damage, "[c]ourts generally . . . do not permit tort recovery for a defective product's damage to itself." *Id.* at 273; *see also In re Hannaford Bros. Co. Customer Data Security Breach Litig.*, 613 F. Supp. 2d 108, 127 (D. Me. 2009).

The Law Court in *Peachtree* further determined "[d]amage to a product itself . . . means simply that the product has not met the customer's expectations, or, in other words, that the customer has received 'insufficient product value.'" *Peachtree*, 659 A.2d at 270. The doctrine requires courts to "distinguish between a situation where the injury suffered is merely the 'failure of the product to function properly . . . [and] those situations, traditionally within the purview of tort, where the plaintiff has been exposed, through a hazardous product, to an

7

unreasonable risk of injury to his person or property.'" *Fireman's Fund Ins. Co. v. Childs*, 52 F. Supp. 2d 139, 142 (D. Me. 1999) (applying Maine law) (*citing East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 868 (1986)). Where there is no contractual relationship between the buyer and seller, the applicability of the economic loss doctrine can be called into question, *see Fireman's Fund*, 52 F. Supp. 2d at 143-44; *Banknorth, N.A. v. BJ's Wholesale Club, Inc.*, 394 F. Supp. 2d 283 (D. Me. 2005).

DCCI argues that the rule of *Peachtree* does not apply at all to this case, because this case is not a classic "products liability" case, i.e., a case in which a product was "injured", i.e. failed, after being put into use. In other words, DCCI says *Peachtree* does not apply to cases in which the product never was what it was represented to be. This is a metaphysical distinction without a difference (at least when there is no allegation of fraud, as discussed below). Any claim for breach of warranty or negligent misrepresentation requires a showing that the product at issue was, from the outset, not as warranted or represented, even if the defect emerges later. That was the contention in *Peachtree* and is the contention here.

Notably, the plaintiff's complaint in the *Peachtree* case included a negligent misrepresentation count, *see* 659 A.2d at 269, and the Law Court upheld the grant of summary judgment on that count based on the economic loss doctrine. However, there was no fraud or intentional misrepresentation count in *Peachtree*, and the legal question whether the economic loss doctrine precludes a tort claim for fraud or intentional misrepresentation is still open under Maine law. DCCI's opposition to Mr. Parker's economic loss argument focuses on the fraud count and not on the negligent misrepresentation count. Although the court does not interpret DCCI's opposition to concede formally that *Peachtree* precludes the negligent misrepresentation claim in Count II of DCCI's Amended Complaint, the rule of *Peachtree*

8

explicitly applies to negligent misrepresentation claims, and the court therefore will grant Mr. Parker's motion as to Count II.

However, for the following reasons, the court comes to a different conclusion as to the fraud claim in Count I. It is well settled in Maine law that "[f]raud in the inducement of a contract may vitiate the terms of that contract. *Barr v. Dyke*, 2012 ME 108, ¶ 16, 49 A.3d 1280, 1286, *citing Harriman v. Maddocks*, 560 A.2d 11, 12–13 (Me.1989). The rationale for precluding tort claims in favor of contractual remedies under the UCC disappears when a contract is voidable for fraud.

Moreover, two provisions of the UCC explicitly preserve common law fraud remedies in situations otherwise governed by the UCC. One of the general provisions of the Maine UCC provides in part: "Unless displaced by the particular provisions of the Uniform Commercial Code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy and other validating or invalidating cause supplement its provisions." 11 M.R.S. § 1-1103(2). There is no UCC section that displaces the common law remedy for fraud. The other section in question, section 2-721 of the Maine UCC, titled "Remedies for Fraud," makes UCC remedies available for fraud without displacing common law remedies: "Remedies for material misrepresentation or fraud include all remedies available under this Article for nonfraudulent breach. Neither rescission or a claim for rescission of the contract for sale nor rejection or return of the goods shall bar or be deemed inconsistent with a claim for damages or other remedy" (emphasis added).

Taken together, these sections indicate that, although the UCC may in some sales cases furnish the exclusive remedies for "nonfraudulent breach," the UCC supplements and does not

9

preclude remedies for fraud.[1] Based on that conclusion, and because the legal issue is open in Maine, this court concludes that the Maine Law Court would likely decide that the economic loss doctrine does not bar a claim of fraud or intentional misrepresentation, even in a case involving sale of a good subject to Article 2 of the Maine UCC and not involving personal injury or damage to other property. Accordingly, Mr. Parker's Motion for Summary Judgment is denied as to Count I.

Conclusion

IT IS HEREBY ORDERED AND ADJUDGED: Defendant Kendrick Parker's Motion for Summary Judgment is granted as to Count II of the Amended Complaint and is otherwise denied.

Pursuant to M.R. Civ. P. 79(a), the Clerk shall incorporate this order into the docket by reference.

Dated April 30, 2015

A. M. Horton
Justice, Business and Consumer Court

---

[1] One view attempts to distinguish between the types of fraud that are subject to the economic loss doctrine, holding claims of fraud in the inducement not to be barred by the economic loss doctrine and claims of "fraud interwoven with the breach" to be barred. *See Huron Tool v. Precision Consulting Servs.*, 532 N.W.2d 541, 544-45 (Mich. Ct. App. 1995), *discussed in* S. Tourek, T. Boyd & C. Schoenwetter, *Bucking the "Trend": The Uniform Commercial Code, the Economic Loss Doctrine, and Common Law Causes of Action for Fraud and Misrepresentation*, 84 IOWA L.REV. 875, 938 (1999). The premise that fraud in the inducement is different than fraud "interwoven" with the breach may be doubtful, but the so-called distinction does not matter here, because DCCI's claim plainly is one of fraud in the inducement.

Entered on the Docket: 4-30-15
Copies sent via Mail ___ Electronically ✓

**DCCI, LLC v. Kendrick Parker**

**BCD-CV-2013-65**


**DCCI, LLC**

    **Plaintiff**

        Counsel:               Walter McKee, Esq.
                                McKee Billings, LLC PA
                                133 State Street
                                Augusta, ME 04330


**Kendrick Parker**

    **Defendant**

        Counsel:                Paul Sumberg, Esq.
                                  263 Water Street
                                  PO Box 9
                                Skowhegan, ME 04976-0009